CHARLES E. GODFREY & others vs. MASSACHUSETTS
MEDICAL SERVICE.

Suffolk.    February 1, 1971. — June 11, 1971.

Present: TAURO, C.J., SPALDING, CUTTER, SPIEGEL, & BRAUCHER, JJ.

*Podiatrist. Medical Service Corporation. Constitutional Law,* Due process
of law, Police power, Podiatrist, Medical service corporation. *Ad-
ministrative Matter. Equity Jurisdiction,* Class suit. *Equity Pleading
and Practice,* Appeal.

In a suit in equity for declaratory relief by certain podiatrists against
a nonprofit medical service corporation organized under G. L.
c. 176B, the record showed that the Legislature, in devising a statutory
insurance framework for medical service at low cost to the public, had
a rational basis for classifying physicians and podiatrists separately,
and there was no violation of the equal protection and due process
clauses of the Fourteenth Amendment to the United States Constitution
as to the plaintiffs in that § 7 of c. 176B gave only to registered physicians
"the right . . . to enter into a written agreement with a medical service
corporation . . . to perform medical service." [614–615, 617]
Refusal of a nonprofit medical service corporation organized under
G. L. c. 176B to enter into contracts with podiatrists for services
rendered by them to subscribers to the corporation's medical service
plan, pursuant to the discretion given to the corporation by § 4, was
not shown to be arbitrary and unreasonable and in violation of the
equal protection and due process clauses of the Fourteenth Amendment
to the United States Constitution in a suit in equity for declaratory
relief by certain podiatrists, where it appeared that the refusal was
based on the well substantiated opinion of the corporation's board of
directors that it would not be in the best interests of the public or of
the corporation to include podiatrists in the plan, and its executive
director testified that the inclusion of podiatrists would result in an
increase in subscription costs and that there was "no dearth of registered
physicians to perform the services which podiatrists perform." [618–619]
The bill in a suit in equity for declaratory relief by seven podiatrists
against a nonprofit medical service corporation organized under G. L.
c. 176B which refused to accept the application of each of the plaintiffs
to participate in the defendant's medical service plan plainly met the
criteria for maintenance of a class suit outlined in *Spear* v. *H. V.
Greene Co.* 246 Mass. 259, and it was error for the trial judge to rule

that "[t]his is not a class suit [and] [i]n consequence, the named plaintiffs do not represent Massachusetts podiatrists, or any portion of them, as a class in this proceeding." [620–621]

BILL IN EQUITY filed in the Superior Court on September 3, 1965.

The case was heard by *Dimond, J.*

*Joseph P. Rooney (William F. Kehoe* with him) for the plaintiffs.

*Lawrence T. Perera (John G. Faria* with him) for the defendant.

SPIEGEL, J.  This is a bill for declaratory relief brought as a class suit by seven podiatrists against the Massachusetts Medical Service, commonly known as Blue Shield. The plaintiffs seek, inter alia, a declaration that G. L. c. 176B, inserted by St. 1941, c. 306, authorizes podiatrists to participate "as a matter of right" in the Blue Shield nonprofit medical service plan.  The hearing in the case was "completed" before a judge of the Superior Court who died "without record of any decision, findings of fact, . . . determination . . . [or] report having been made by her prior to her death."  Thereafter, by agreement of the parties, the case was assigned to another judge for determination "on the basis of the pleadings and record of the case as contained in the official transcript and the exhibits on file . . . and the briefs submitted by the parties."  The latter judge, after oral argument, made "Findings of Fact, Rulings of Law, and Order for Decree."  The plaintiffs appeal from a final decree containing the following declarations: "1. This is not a class suit and the named plaintiffs do not represent Massachusetts podiatrists, or any portion of them, as a class, in this proceeding.  2. General Laws Chapter 176B, Section 7, furnishes the exclusive rule governing participation as of right in the defendant's medical service plan. Since only registered physicians may participate under that section and since the plaintiffs are not registered physicians, they are not entitled to participate as of right.  3. General Laws Chapter 176B, Section 7, does not deny any of the plaintiffs equal protection of the laws or due process of law

under either the United States or Massachusetts constitutions.  4. General Laws Chapter 176B, Section 4, does not require the defendant to accept the applications of any of the plaintiffs to participate in the defendant's medical service plan.  5. General Laws Chapter 176B, Section 4, does not deny any of the plaintiffs equal protection of the laws or due process of law under either the United States or Massachusetts constitutions.  6. The defendant's refusal to accept the applications of each of the plaintiffs to participate in the defendant's medical service plan was not unlawful.'

We have before us "Designated Portions of Transcript of Testimony." In the circumstances, we are in as good a position as the judge who ordered the entry of the decree to appraise the evidence and we make our own determination uneffected by his findings. See *Drescher* v. *Travelers Ins. Co., ante,* 458.

This case involves the constitutionality of the nonprofit medical service plan as it is embodied in G. L. c. 176B. Section 4 of that statute, as amended through St. 1968, c. 432, § 9, provides in pertinent part as follows: "Any medical service corporation *may* enter into contracts with its subscribers and with participating physicians, dentists, chiropodists (podiatrists) and optometrists licensed under the laws of the commonwealth, for such medical, visual and surgical services as may lawfully be rendered by them to the subscribers and to their dependents, and *may* pay for such services" (emphasis supplied).  Section 7 of c. 176B provides in pertinent part: "Every registered physician shall have the *right* . . . to enter into a written agreement with a medical service corporation . . . to perform medical service" (emphasis supplied).  Medical service is defined as that "ordinarily provided by registered physicians in accordance with accepted practices in the community where the services are rendered." G. L. c. 176B, § 1.

Essentially, we are called upon to decide (1) whether § 7 of c. 176B, by allowing only physicians to participate as a matter of right in the Blue Shield program, arbitrarily and unreasonably discriminates between physicians and podi-

atrists in violation of the equal protection and due process clauses of the Fourteenth Amendment to the United States Constitution and (2) whether the discretionary power granted to the defendant by § 4 to exclude podiatrists from the Blue Shield program was exercised in an arbitrary and unreasonable manner in violation of the above constitutional provisions. We also briefly consider whether the bill was properly brought as a class suit. In view of our disposition of this case we find it unnecessary to treat with the issues raised in the plaintiffs' briefs concerning (1) whether the defendant is a quasi public corporation so as to bring it within the ambit of the "state action" doctrine and (2) whether the term "surgical services" as it is used in G. L. c. 176B, § 4, should be broadly construed.

Section 4 clearly grants to the defendant the discretion to enter into contracts with podiatrists. See *Answer of the Justices*, 346 Mass. 787, 790. It is also clear that § 7 gives only to physicians the *right* to contract with Blue Shield. The plaintiffs contend, however, that the defendant is a quasi public corporation and that its discretionary power to exclude podiatrists from the program was exercised in an arbitrary and unreasonable manner. They further argue that § 7 unfairly and unreasonably discriminates between physicians and podiatrists which they assert are two similarly circumstanced classes of persons.

It is well established that legislation will be upheld "[u]nless . . . [it] cannot be supported upon any rational basis of fact that reasonably can be conceived to sustain it." *Sperry & Hutchinson Co.* v. *Director of the Div. on the Necessaries of Life*, 307 Mass. 408, 418. *Coffee-Rich, Inc.* v. *Commissioner of Pub. Health*, 348 Mass. 414, 422. A statutory distinction or classification satisfies constitutional requirements "if it is rational and bears some relationship to the object intended to be accomplished." *Hall-Omar Baking Co.* v. *Commissioner of Labor & Indus.* 344 Mass. 695, 700. The Legislature must be afforded wide discretion in accomplishing its objectives. See *Opinion of the Justices*, 303 Mass. 631. "If the question is fairly debatable, courts

cannot substitute their judgment for that of the Legislature." *Druzik* v. *Board of Health of Haverhill*, 324 Mass. 129, 139. "One assailing a statute on constitutional grounds has the burden of proving the absence of any conceivable grounds upon which the statute may be supported. 'As underlying questions of fact may condition the constitutionality of legislation . . . , the presumption of constitutionality must prevail in the absence of some factual foundation of record for overthrowing the statute.'" *Merit Oil Co.* v. *Director of the Div. on the Necessaries of Life*, 319 Mass. 301, 305, quoting *O'Gorman & Young, Inc.* v. *Hartford Fire Ins. Co.* 282 U. S. 251, 257–258. The Supreme Court of the United States in the case of *Lindsley* v. *Natural Carbonic Gas Co.* 220 U. S. 61, 78–79, summarized the law in this area as follows: "The rules by which . . . [the alleged violation of the equal protection clause] must be tested, as is shown by repeated decisions of this court, are these: 1. The equal protection clause of the Fourteenth Amendment does not take from the State the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis and therefore is purely arbitrary. 2. A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety or because in practice it results in some inequality. 3. When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed. 4. One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary."

In determining whether the classification drawn between physicians and podiatrists by G. L. c. 176B bears a reasonable relationship to the purpose of the statute, we note that the statute has as its purpose to provide "for the preservation of the public health by furnishing medical services at low cost to members of the public who become subscribers."

Emergency preamble, St. 1941, c. 306. This protection of the public health is within the police power of the State and "is an object of such vital importance to the welfare of the State that any rational means to that end must be upheld." *Commonwealth* v. *Zimmerman,* 221 Mass. 184, 189–190.

Applying the standards previously recited and that of the *Zimmerman* case to the instant one, we think that in devising a statutory insurance framework for medical services at low cost to the public it was within the power of the Legislature to make a statutory distinction between physicians and podiatrists. The record shows that Dr. Charles G. Hayden, the executive director of the defendant, testified and deposed that if Blue Shield included podiatrists within its program, it would be assuming an additional financial burden in spite of a lack of demand by subscribers for such coverage. Dr. Hayden's belief was based on the fact that when a new group of participants, such as oral surgeons, have been included in the Blue Shield program, costs have increased. Increased expenses would, of necessity, create increased rates to Blue Shield subscribers. This, of course, would not be beneficial to the public as a whole and would provide a sufficiently rational basis to uphold the classification. Although the judge made no specific finding whether subscription costs would actually be increased if podiatrists were included in Blue Shield, he did find that "subscribing groups have not made any significant request that the defendant's medical service plan should provide for participation by podiatrists or for payments to them." The fact that there has been little or no demand to have the services of a podiatrist included within the Blue Shield program lends credence to the proposition that the public health would not be significantly enhanced by having such services performed by podiatrists when the likelihood exists that an increase in subscription costs would occur.

In addition to the likelihood of increased costs, we note that there is a substantial difference between the educational and preparatory requirements of a physician and those of a

podiatrist[1] as well as in the general scope of their practices. General Laws c. 112, § 13, as appearing in St. 1956, c. 344, narrowly defines the practice of podiatry as "the diagnosis

---

[1] Compare G. L. c. 112, § 2, as amended, delineating the registration and examination requirements for a physician with G. L. c. 112, § 16, as amended, prescribing the registration requirements for a podiatrist. The record also shows that applicants seeking registration as podiatrists were all high school graduates and had the following educational backgrounds: "1. Worcester Junior College, one year; Ohio College of Podiatry, four years. 2. Suffolk University, two years; University of Chicago, one year; Illinois College of Podiatry, four years. 3. Newton Junior College, one year; Ohio College of Podiatry, four years. 4. St. Michael's College, two and one-half years; University of Hartford, one and one-half years; Illinois College of Chiropody, four years. 5. McKendree, two years; Ohio College of Podiatry, four years. 6. Rutgers University, two years; Illinois College of Chiropody, four years. 7. New York University, three years; Illinois College of Podiatry, four years. 8. No college entry; Beacon Institute, three years. 9. New York City Community College, approximately four years evenings; M. J. Lewi College of Podiatry. 10. West Virginia University, Special Studies, one year; Temple University, School of Chiropody, two years. 11. Tufts University, three years; Chiropody School, Ohio College of Podiatry, four years. 12. Weston Junior College, one year; Boston University, one year; Ohio College of Podiatry, four years. 13. Stonehill College, four years; Pennsylvania College of Podiatry, four years. 14. Long Island University, three years, Chiropody School; M. J. Lewi College of Podiatry, four years. 15. Fairleigh Dickinson University, two years; M. J. Lewi College of Podiatry, four years. 16. St. Lawrence University, four years; Illinois College of Podiatry, four years. 17. No College entry; Chicago College of Podiatry, four years. 18. No college entry. 19. No college entry; Chiropody School, Ohio College of Podiatry. 20. University of Massachusetts, two years; Chiropody School, Temple University, four years."

The record also contains testimony of Dr. Nason Burden, a medical doctor and Dr. Joseph Guy, a podiatrist. Dr. Burden received his bachelor's degree from DePauw University in Indiana in 1938. He then attended the Tufts College of Medicine and earned the degree of Doctor of Medicine in 1942. After a year of rotating internship at St. Luke's Hospital, New Bedford, Massachusetts, he served in the Army Air Corps, Pacific Theater, for four years doing work in orthopedic surgery. Following his discharge from the Army he entered general practice. After five years of general practice, he entered formal orthopedic training which involved rotational training at Boston City Hospital, the Veteran's Hospital in West Roxbury, the Lakeville State Sanitorium, and the Massachusetts Hospital School in Canton. Dr. Burden testified that the usual residency training required in orthopedics lasts five years: one year is spent in general rotating internship, one year in surgical residency, and three years in rotational orthopedic training. After passing his "Boards," Dr. Burden was elected to the American Academy of Orthopedic Surgeons and after completion of his residencies he commenced the practice of orthopedic surgery.

Dr. Joseph Guy testified that he did not graduate from high school, and that he attended Malden High School for one year. After holding various jobs, Dr. Guy attended the Middlesex College School of Podiatry for three years. He took the State board of podiatry examination and obtained a license to practise. He subsequently received a Doctor of Surgical Chiropody (D.S.C.) degree from Temple University, Philadelphia, Pennsylvania. He satisfied the requirements for this degree by traveling to Philadelphia one weekend a month for a nine-month period. Weekend instruction consisted of twenty-four hours of classroom instruction.

and the treatment of the structures of the human foot by medical, mechanical, surgical, manipulative and electric means without the use of other than local anesthetics, and excepting treatment of systemic conditions, and excluding amputation of the foot or toes." Without delineating the scope of a physician's practice, it is apparent that it is not limited merely to the treatment of the foot. The differences between the scope of a physician's practice and that of a podiatrist are reflected by various licensing statutes of the Commonwealth which assign a vastly more significant role to physicians as opposed to podiatrists in the protection of the public health.[2]

In view of the great disparity between the extent of a physician's practice and that of a podiatrist, the more stringent educational and preparatory requirements demanded of a physician, the lack of a public outcry to have the services of a podiatrist included within the Blue Shield program and the possibility that the subscribing public would bear the cost of having podiatrists included, we cannot say that, by making the inclusion of podiatrists optional rather than mandatory, G. L. c. 176B has denied the plaintiffs the equal protection of the laws. The Legislature had a rational basis for making the classification and the plaintiffs have not met their burden of proving otherwise.

Similarly, this is not a case where the statute prevents the plaintiffs from practising their profession in a manner violative of the essential elements of due process. See *Falcone* v. *Middlesex County Medical Soc.* 34 N. J. 582, upon which the plaintiffs heavily rely, where an osteopathic surgeon was

[2] See, for example, G. L. c. 112, §§ 9 and 9A, which allow limited registration of interns and medical students to provide medical services to the public. Students of podiatry are not so privileged. General Laws c. 111, § 26, provides that one member of a city board of health must be a physician, but there is no such requirement for podiatrists. General Laws c. 13, § 12A, requires that one member of the board of registration in podiatry must be a physician.

In their reply brief, the plaintiffs argue that the testimony of Dr. Nason Burden "as to matter other than his professional training . . . had no probative value on any issue in the case." The plaintiffs particularly object to his testimony concerning "systemic conditions." In view of the fact that we do not rely on Dr. Burden's testimony, we perceive no need to consider this argument. We only state his professional qualifications. *Supra,* fn. 1.

barred from using local hospitals because he was not a member of the county medical society.   The *Falcone* case is clearly distinguishable from the one before us in that exclusion from the Blue Shield program does not affect the right of the plaintiffs to practise their profession.   In any event, much of the force of the *Falcone* case is weakened by the previous Supreme Court case of *Hayman* v. *Galveston,* 273 U. S. 414, where a regulation by a municipal hospital board excluding osteopathic physicians from practising in the hospital was held not to violate the privileges and immunities, due process and equal protection clauses of the United States Constitution.   In rejecting the argument "that if some physicians are admitted to practice in the hospital all must be or there is a denial of the equal protection of the laws," the court said, "Even assuming that the arbitrary exclusion of some physicians would have that legal consequence in the circumstances of this case, the selection complained of was based upon a classification not arbitrary or unreasonable on its face. . . . We cannot say that a regulation excluding from the conduct of a hospital the devotees of some of the numerous systems or methods of treating diseases authorized to practice in Texas, is unreasonable or arbitrary.   In the management of a hospital, quite apart from its use for educational purposes, some choice in methods of treatment would seem inevitable, and a selection based upon a classification having some basis in the exercise of the judgment of the state board whose action is challenged is not a denial of the equal protection of the laws."   273 U. S. at 417.

We next consider the plaintiffs' contention that the defendant's exclusion of podiatrists was done in an arbitrary and unreasonable manner.   Where the Legislature has delegated administrative power to a public authority, the exercise of such power cannot be attacked unless the authority acts in violation of the statute or in a capricious, whimsical or arbitrary manner. *New Bedford* v. *New Bedford, Woods Hole, Martha's Vineyard & Nantucket S.S. Authy.* 330 Mass. 422, 431.

The defendant's reasons for refusing to include podiatrists

in the Blue Shield program were expressed by its board of directors as not being in the best interests of (a) the public and (b) the defendant. Dr. Hayden testified that the bases for the opinion of the defendant's board of directors that inclusion would not be in the best interests of the public were (1) the expressed opinion of the Massachusetts Medical Society, (2) the expressed opinion of the defendant's Central Professional Service Committee, and (3) the lack of a public demand for their inclusion. Dr. Hayden also testified that their inclusion was not in the best interests of the defendant because it would result in an increase in subscription costs and there was "no dearth of registered physicians to perform the services which podiatrists perform."

We do not think that the foregoing reasons for excluding podiatrists are capricious, whimsical or arbitrary. This conclusion is supported by cases in other States which have relied on similar considerations in justifying the statutory exclusion of podiatrists from Blue Shield programs. *Kennedy* v. *Medical Serv. Assn. of Pa.* 39 D. & C. 2d (Pa.) 27, 34. *Medical Care, Inc.* v. *Chiropody Assn. of West Va.* 141 W. Va. 741, 750. *State Medical Soc. of Wis.* v. *Manson,* 24 Wis. 2d 402, 406. These factors were also considered relevant by the senate committee of the Legislature which in 1964 recommended that Blue Shield not be required to enter into contracts with podiatrists.[3]

---

[3] Senate Report No. 958, May 15, 1964, pp. 151–154, is entitled "Final Report of the Special Commission to Investigate and Study the Laws Relative to Non-Profit Hospital and Medical Service Corporations, and the Rising Cost of Hospital and Medical Care and Hospital Accommodations." The report states, in part: "Blue Shield justified its refusal to enter into contracts with podiatrists on the ground that few podiatrists render services that require hospitalization, and that there are no services offered by Blue Shield which podiatrists can provide which are not presently available to subscribers through participating physicians. Blue Shield pointed out that there has been no demand from subscribers that Blue Shield expand its services to include benefits for podiatry. . . . The Massachusetts Medical Society has opposed the inclusion of podiatrists as participants in the Blue Shield program for the following reasons: (1) There has been no spontaneous public demand for the inclusion of podiatry services within Blue Shield. (2) Podiatry services do not involve expenditures large enough to require budgetary coverage. (3) Inclusion of podiatrists will make available to subscribers no services not presently available under the existing Blue Shield plan. (4) Blue Shield is basically oriented towards rendering services for hospitalized pa-

The plaintiffs' argument that G. L. c. 176B constitutes an unconstitutional and unlawful delegation of legislative power to an interested private group, Massachusetts Medical Society, is without merit. There is no evidence in the record that the board of directors of Blue Shield is subservient to the Massachusetts Medical Society or that the board acted otherwise than in the best interests of Blue Shield.

The ruling of the judge that "[t]his is not a class suit [and] [i]n consequence, the named plaintiffs do not represent Massachusetts podiatrists, or any portion of them, as a class in this proceeding" was error. A class suit is maintainable "where a few individuals are fairly representative of the legal and equitable rights of a large number who cannot readily be joined as parties. The persons suing as representatives of a class must show by the allegations of their bill that all the persons whom they profess to represent have a common interest in the subject matter of the suit and a right and interest to ask for the same relief against the defendants. It is not essential that the interest of each member of the class be identical in all aspects with that of the plaintiffs. The interest must arise out of a common relationship to a definite wrong. There must be a joint prejudice to all the class whom the plaintiffs seek to represent." *Spear* v. *H. V. Greene Co.* 246 Mass. 259, 266. Compare *MacDonald* v. *Carr,* 355 Mass. 120, 126–127. The bill

---

tients and very few chiropodists have or can be granted hospital privileges. Blue Shield is unwilling to cover any services rendered by chiropodists and has given the following reasons: (1) Chiropodists have contributed nothing to the success of Blue Shield and are today in no position to add anything of consequence for Blue Shield subscribers. (2) There is today no shortage of Blue Shield participating physicians and oral surgeons to render all of the Blue Shield services available to subscribers. . . . After weighing all the evidence and the testimony, the Commission has concluded that there has been no spontaneous public demand for the inclusion of podiatry services by Blue Shield and that Blue Shield should not be compelled by statute to enter into contracts with chiropodists (podiatrists). The Commission feels that podiatry services do not involve, for the most part, expenditures of great consequence and present no unusual problem at the present time to the average person who seeks . . . [the] services [of a podiatrist]. The Commission would offer no objection to the passage of enabling legislation granting the chiropodists authority to set up a non-profit . . . [podiatry] corporation similar to laws enabling dental and optometric service corporations to be set up."

plainly meets the criteria outlined in the *Spear* case and, therefore, was properly brought as a class suit.

The decree is modified by striking therefrom the paragraph numbered 1 and as so modified is affirmed.

*So ordered.*