BLUE SHIELD OF MASSACHUSETTS, INC. *vs*. BOARD OF REVIEW
IN THE DIVISION OF INSURANCE & another[1]
(and two companion cases[2]).

Suffolk. February 12, 1986. — May 6, 1986.

Present: ARMSTRONG, PERRETTA, & KASS, JJ.

*Medical Service Corporation. Psychologist. Insurance*, Board of review.
*Administrative Law*, Medical service corporation, Agency's authority,
Regulations.

A psychologist who, in entering into a participating psychologist's agree-
ment with a medical service corporation organized under G. L. c. 176B,
agreed to be bound by "all by-laws and rules and regulations of [the
corporation]" was subject to discipline by the corporation for violation
of one of its rules, despite the fact that at the time of the violation the
rules and regulations specifically referred to the obligations of participat-
ing physicians and dentists only, and to no other health care providers.
[163-165]
The board of review in the Division of Insurance did not exceed its authority
under G. L. c. 176B, § 12, by modifying the sanctions imposed by an
internal review committee of a medical service corporation on a health
care provider for his violation of the rules and regulations of the corpo-
ration. [165-169]

CIVIL ACTIONS commenced in the Superior Court Department
on June 29, 1983, August 1, 1983, and December 16, 1983,
respectively.

The cases were heard by *Thomas R. Morse, Jr.,* J.

*Daniel A. Shapiro* for Martin M. Grossack.

*William L. Pardee*, Assistant Attorney General, for Board
of Review in the Division of Insurance.

*John T. Harding, Jr.* (*Jeffrey Swope* with him) for Blue Shield
of Massachusetts, Inc.

---

[1] Martin M. Grossack.

[2] The companion cases are between the same parties.

KASS, J.   After hearing, Blue Shield of Massachusetts, Inc. (Blue Shield), acting by its Central Professional Services Committee, struck Martin M. Grossack from its roster of participating psychologists, effective October 15, 1978. Blue Shield's reasons were that Grossack "ha[d] violated Rule 2 of the Blue Shield Rules and Regulations and ha[d] submitted improper claims to Blue Shield for compensation."

On this appeal the principal questions are whether, on the dates in question,[3] the Blue Shield rule (i.e., rule 2) which Grossack violated applied to psychologists and whether, if it did, the board of review in the Division of Insurance (the "board") had authority to adjust the sanction to be imposed on Grossack. We think the rule did apply to Grossack and that the board can set the penalty.

We review the pertinent facts and proceedings. Grossack is a licensed psychologist. In 1975, he entered into a participating psychologist's agreement with Blue Shield, a medical service corporation organized under G. L. c. 176B.[4] Complaints came to the attention of Blue Shield that Grossack was ordering unnecessary psychological tests for patients, recruiting clients for "weight loss" and "quit smoking" programs to run up charges against the Blue Shield system, and that he was in violation of rule 2. That rule, as written when Grossack was said to have violated it, required "the participating physician or participating dentist" to "perform such services in person." Services performed by an employee "under the direct, personal and continuous supervision of the participating physician or participating dentist" would qualify, but providing direct, personal and continuous supervision required proximity. Telephone contact would not do. The assistant must, as a Blue Shield witness put it, be "within hollering distance."[5]

---

[3] August 23, 1976, through May 23, 1978.

[4] An account of legislative history of G. L. c. 176B and that statute's purposes appears in *Kartell* v. *Blue Shield of Mass., Inc.*, 384 Mass. 409, 420-421 (1981).

[5] The text of the rule, at the times material, was as follows: "To be eligible to receive payment for services, the participating physician or participating dentist must perform such services in person which shall be deemed to

After Blue Shield's Central Professional Services Committee issued a decision adverse to him, Grossack availed himself of the right, provided in G. L. c. 176B, § 12, to have Blue Shield's decision reviewed by the board.[6] The board determined that: (1) rule 2, during the period of Grossack's alleged violations, applied to psychologists as well as physicians and dentists and (2) Grossack had violated rule 2 in that he had billed Blue Shield for services which he did not personally render or supervise, and had submitted forms signed by him to Blue Shield certifying that he had personally rendered or supervised those services. As to the charge of billing for unnecessary or inappropriate services, the board concluded that Blue Shield had not made its case. The board did find, however, that Grossack had submitted claims for incomplete testing services.

For those infractions, the board thought, permanent expulsion from the ranks of providers was an excessive sanction. The board ordered that "Dr. Grossack is to be reinstated as a participating Blue Shield provider of psychological services on October 15, 1983. The reinstatement is conditioned on Dr. Grossack's restitution of all Blue Shield payments made for incomplete services or upon false certifications as found in this decision."

---

include services performed by an assistant who is a full-time employee of the participating physician or participating dentist, who is authorized by law to perform such services, who performs the services under the direct, personal and continuous supervision of the participating physician or participating dentist, and for whose services the participating physician or participating dentist customarily includes the charges in his bill. To be providing direct, personal and continuous supervision, the participating physician or participating dentist need not be in the room where the services are being performed at all times but must be close by and available to provide immediate personal assistance and direction. Availability by telephone shall not constitute direct, personal and continuous supervision."

[6] General Laws c. 176B, § 12, as amended through St. 1981, c. 623, § 3, provides, "Any . . . controversy arising between a medical service corporation and any . . . participating provider of health services . . . may . . . be submitted by any person aggrieved to a board serving in the division of insurance." That board consists of the Commissioner of Insurance, the chairman of the board of registration and discipline in medicine, and the Attorney General, or their respective designees.

Neither Blue Shield nor Grossack was content with the board's decision, and they brought complaints seeking review under G. L. c. 176B, § 12, in the Superior Court. That review is in the nature of administrative review under G. L. c. 30A, § 14. Cf. *Nelson* v. *Blue Shield of Mass., Inc.*, 377 Mass. 746, 753 (1979); *Massachusetts Assn. of Older Americans, Inc.* v. *Commissioner of Ins.*, 393 Mass. 404, 409 (1984). A judge of that court ruled that rule 2 applied to psychologists and that Grossack had violated it. He ruled also that the board had exceeded its jurisdiction by ordering the reinstatement of Grossack and vacated that portion of the board's order. Judgment entered accordingly. This time the board and Grossack appealed.

1. *Applicability of rule 2.* Grossack's contract with Blue Shield bound him to "all by-laws and rules and regulations of [Blue Shield]." In the form in which they were printed when distributed to Grossack, those rules and regulations refer to the obligations of participating *physicians* and participating *dentists* and no other providers of service. As a matter of elementary contract construction, Grossack argues, rules and regulations for physicians and dentists do not apply to psychologists. Consequently, he has violated no rule or regulation and, the argument continues, the foundation of Blue Shield's disciplinary proceeding collapses. If the argument were correct, no rules or regulations of any kind would have applied to psychologists, because the rules and regulations Grossack disavows were the only rules and regulations there were. Thus, in addition to the restrictive aspect of rule 2,[7] no rules or regulations would have governed psychologists concerning payment for services (which one supposes Grossack would want to have apply), information relating to services rendered, the charges made, unusual circumstances which the provider wants Blue Cross to consider, and certain patient information.

---

[7] Rule 2 is not entirely a rule of limitation. Fundamentally, it is expansive because it authorizes Blue Shield payment for services delivered through a surrogate. But for rule 2, there is doubt whether a contractor with Blue Shield could recover fees for such services.

We do not suppose that providers of health services to Blue Shield other than physicians and dentists could have thought themselves free from, or without recourse to, the panoply of procedures for securing payment for services from Blue Shield. Construction of contracts takes into account "honest purpose in accord with common sense." *Kennedy Bros.* v. *Bird*, 287 Mass. 477, 483 (1934). *Lipton Professional Soccer, Inc.* v. *Bay State Harness Horse Racing & Breeding Assn.*, 8 Mass. App. Ct. 458, 462-463 (1979). It also takes into account the situation of the parties when they entered into the contract and objects they sought to accomplish. *Shea* v. *Bay State Gas Co.*, 383 Mass. 218, 222-223 (1981). The original statutory framework was designed for the participation of physicians only. See St. 1941, c. 306; *Massachusetts Med. Serv.* v. *Commissioner of Ins.*, 344 Mass. 335, 336 (1962). By statutory amendments such as St. 1950, c. 472 (dentists), St. 1959, c. 130 (podiatrists), St. 1965, c. 442, § 1 (optometrists), St. 1969, c. 880, § 1 (chiropractors), and St. 1985, c. 683, § 3 (nurse midwives), other health care providers were placed in that framework. In 1971, the category of persons with whom Blue Shield could enter into contracts was extended to "other providers of health services." St. 1971, c. 543, § 3. The vocabulary of Blue Shield's rules and regulations, written when the statutory range of health care providers was relatively narrow was, as that range expanded, required to do broader service than the dictionary meanings of physicians and dentists.[8]

The application of the rules and regulations to this particular psychologist is buttressed by the parties' actions after the execution of the contract. See *Martino* v. *First. Natl. Bank*, 361 Mass. 325, 332 (1972); *Bourgeois* v. *Hurley*, 8 Mass. App. Ct. 213, 215-216 (1979). The board found that: As a new, participating psychologist Grossack had received a set of the rules and regulations, which he discussed with a Blue Shield professional relations representative. With that representative (Mary Peters), Grossack explored how aspects of his practice fit within the strictures of rule 2. He attended a meeting in

---

[8] In 1981, Blue Shield amended its rules and regulations so that they now apply explicitly to all health care providers.

1976 at which Blue Shield's policy concerning payment for services of supervised assistants was a topic. During the first half of 1977, Blue Shield sent to its participating psychologists a "Reference Manual for Participating Psychologists" which included a copy of rule 2. Grossack received that manual. We are satisfied that the record supports the ruling that Grossack was subject to rule 2. There is also substantial evidence to support the finding and determination that Grossack violated the rules by billing for testing services which were incomplete. See *Craven* v. *State Ethics Commn.*, 390 Mass. 191, 201 (1983); *Rico's of the Berkshires, Inc.* v. *Alcoholic Beverages Control Commn.*, 19 Mass. App. Ct. 1026, 1027 (1985); Cella, Administrative Law and Practice § 246 n.1 (1986), a comprehensive collection of the cases.

2. *The board's authority to adjust the discipline imposed on a provider.* On the second major issue, the parties are in different alignment. Blue Shield is on one side while the board and Grossack are united in the view that G. L. c. 176B, § 12, confers upon the board authority to modify the sanctions imposed by Blue Shield on an errant provider. It will be recalled that the Superior Court judgment was to the contrary, i.e., that the board, in tempering the sanction imposed on Grossack, had exceeded its authority.

In support of that judgment, Blue Shield argues that, since the statutory basis in G. L. c. 176B, § 4, for contracting with psychologists is permissive, what Blue Shield may grant, it may take away. Moreover, Blue Shield suggests, the legislative history of G. L. c. 176B, § 13, discloses a legislative intent to vest rights of participation in physicians, chiropractors, and nurse midwives which other health care providers, such as psychologists, do not enjoy. Above all, Blue Shield contends, G. L. c. 176B, § 7, as amended by St. 1981, c. 623, § 2, authorizes a medical service corporation to "terminate its agreement with . . . any other participating provider of health services . . . (a) for failure to comply with . . . reasonable rules and regulations . . . or (b) for presenting any fraudulent, unreasonable, or improper claim for payment, or compensation." Relying on that language, Blue Shield claims an untrammeled

right to expel a health provider without time limit, once its own internal review committee and the board have found that violations of the character described in § 7 have occurred.

Analysis of the text of G. L. c. 176B, § 12, which establishes the board, does not suggest the limitation on the board's powers which Blue Shield asserts. In assessing the powers of an administrative body, it is useful to look to the instrument which created it. Cella, Administrative Law and Practice § 1 (1986). Section 12 provides that "*Any* dispute or controversy . . . may . . . be submitted by any person aggrieved to [the] board . . . for its decision with respect thereto (emphasis supplied)." Plain language, of course, is the beginning of wisdom about legislative purpose. *Hoffman* v. *Howmedica, Inc.*, 373 Mass. 32, 37 (1977). On the basis of the plain language of the statute, the board's powers of review are very broad. So they were viewed in *Nelson* v. *Blue Shield of Mass., Inc.*, 377 Mass. at 753, in which the court commented, "A complete administrative remedy is provided by G. L. c. 176B, § 12." See also, *Kartell* v. *Blue Shield of Mass., Inc.*, 384 Mass. 409, 422 (1981).

In this case a literal reading of § 12 does not, unless one strains, produce dissonance with other portions of c. 176B. The design of c. 176B is to authorize the organization of non-profit medical service corporations which, in return for exemption from taxes and other benefits, are subject to comprehensive public supervision. *Rose* v. *Board of Review in the Div. of Ins.*, 346 Mass. 581, 585 (1964). *Nelson* v. *Blue Shield of Mass., Inc.*, 377 Mass. at 751. Apart from the absence of any words of limitation, it does not strike us as plausible that the Legislature intended to confer on the board power to decide rights between the contracting parties but to restrict the board from having anything to say about the remedy.[9] Rights and remedies are interdependent components of dispute resolution. Cf. *Globe Newspaper Co.* v. *Walker*, 210 U.S. 356, 364 (1908); *Brotherhood of R.R. Trainmen* v. *Howard*, 343 U.S. 768, 774 (1952). Their bifurcation, although not unknown, ought not to be facilely inferred.

---

[9] In this context, we mean remedy to include the idea of sanctions.

In two sections in c. 176B, physicians, chiropractors, and nurse midwives receive rights which constitute them a preferred class compared with other health care providers. Section 7 confers upon physicians, chiropractors, and nurse midwives the right to enter into contracts with a medical service corporation. By contrast, a medical service corporation need contract with other classes of health care providers only if, in its discretion, it chooses to include their ministrations as covered service. See G. L. c. 176B, § 4. Under the second paragraph of § 13, as amended through St. 1985, c. 683, § 9, a physician, chiropractor, or nurse midwife whose right to become a contracting party is denied "because of arbitrary or unfair discrimination" may apply to the Supreme Judicial Court "for an injunction restraining such corporation." Those grants of particular rights do not limit the general review power of the board conferred in § 12. Although the rights conferred upon the preferred providers leaves medical service corporations with somewhat more autonomy over the less favored health care providers, we do not think it is a plausible extension of that observation to insert an unexpressed limitation on the board's § 12 review powers over disputes involving the discretionary class of providers.

Nothing in *Godfrey* v. *Massachusetts Med. Serv.*, 359 Mass. 610 (1971), upon which the Superior Court judge relied and upon which Blue Shield now places reliance, strikes us as being to the contrary. In that case seven podiatrists brought a class action in which they asserted a right to get a foot in the door with Blue Shield as participating health care providers. The court held that the Legislature had rationally limited entitlement to participation to physicians (so the statute then stood) and as to other health care coverage, Blue Shield could, on the basis of its assessment of need and cost, decide whether to include such care in its insurance system. *Godfrey* does not stand for the proposition that, if Blue Shield were to allow a discrete class of health care providers who have specified credentials to participate in the Blue Shield system, it would enjoy discretion to make contracts with some in the designated class and not others. As applied to the case at hand, *Godfrey* affords Blue Shield discretion whether to enter into contacts with

psychologists licensed as a class of health care providers. It does not stand for the principle that, once it elects to cover the services of licensed psychologists, it can pick and choose with whom among licensed psychologists it will deal or that a participating discretionary provider (i.e., a § 4 provider) has a more limited right of review over a dispute under § 12.

Finally, we consider the argument that the final sentence of § 7 in some manner overrides or limits the scope of review of the board under § 12. That sentence provides, "A [medical service] corporation may terminate its agreement with any . . . participating provider of health services" for failure to comply with rules and regulations or for presenting an improper claim for payment. Blue Shield says that if it has statutory authority to terminate its agreement with a participating provider, the board is limited to reviewing whether the provider has committed an offense justifying termination.

For some of the reasons already expressed, e.g., the broad administrative review role of the board and the interdependence of rights and remedies, we do not think the board is foreclosed from reviewing the level of sanction.

We consider the arrangement of the statute. As § 7 precedes the dispute resolution question in § 12, we may infer that the latter, especially in view of the "any dispute" language contained in it, comprehends any dispute raised under preceding sections. See 2A Sands, Sutherland Statutory Construction § 46.05, at 92 (4th ed. 1984). Indeed, penalties which include termination are likely to be a fertile source of submissions for review to the board. A provider may be prepared to admit to an infraction and make restitution (the record here reflects some willingness on Grossack's part, at an early stage of the proceedings, so to do) if only he can be restored to grace as a participating provider. In light of the widespread reliance on third-party payments for medical care, expulsion from Blue Shield is of profound economic consequence to a provider in a class covered by Blue Shield.[10] It would be inconsistent with

---

[10] It appears that when *Nelson* v. *Blue Shield of Mass., Inc.*, 377 Mass. 746 (1979), was decided, Blue Shield covered about 60% of Massachusetts

the legislative design of extensive supervision of medical service corporations to withhold from the board, on which broad powers of review are conferred, the authority to treat of a subject that, as a practical matter, determines whether a provider may engage in his or her vocation.

Termination may be permanent, long, or short. An infraction, after all, could be an isolated one or relatively inconsequential. We are of opinion that the gravity of the sanction may be reviewed by the board under § 12 consistently with the language of § 7 which authorizes termination of agreements. Were review to be denied, there would be the possibility of arbitrary or inappropriate penalties imposed without review in what we have already described as an activity subject to comprehensive public supervision. Cf. *Silver* v. *New York Stock Exch.*, 373 U.S. 341 (1963), in which the court held that a self-regulating organization, because of its quasi public function in governing aspects of dealer access to a major securities market, was bound by due process standards and subject to judicial review. Among the functions of administrative review is to filter out arbitrary treatment and thereby develop a degree of consistency in the disposition of like cases. *NLRB* v. *Wyman-Gordon Co.*, 394 U.S. 759, 765 (1969). *Distrigas of Mass. Corp.* v. *FPC*, 517 F.2d 761, 765 (1st Cir. 1975); Cella, Administrative Law and Practice § 13, at 47 (1986).

For the reasons stated, the judgment in No. 63161 is affirmed. The judgments in Nos. 65777 and 62549 are reversed, and judgments are to be entered in those cases affirming the order of the board, viz., that Grossack is to be reinstated as a participating Blue Shield provider of psychological services, conditioned on his restitution to Blue Shield of all Blue Shield payments made for incomplete services or upon false certifications as found in the board's decision.

*So ordered.*

residents and 99% of physicians who practiced in Masssachusetts had signed an agreement with Blue Shield.