MASSACHUSETTS MEDICAL SERVICE *vs.* COMMISSIONER OF
INSURANCE
(and a companion case[1]).

Suffolk.    March 8, 1962. — May 9, 1962.

Present: SPALDING, WILLIAMS, WHITTEMORE, KIRK, & SPIEGEL, JJ.

*Medical Service Corporation.    Administrative Matter.    Insurance,* Commissioner of Insurance.

Under G. L. c. 176B, § 4, as appearing in St. 1960, c. 307, § 1, the Commissioner of Insurance may disapprove a schedule of fees to be paid by a medical service corporation to participating physicians only if he finds that the fees are inadequate, excessive, or unfairly discriminatory; and he is not empowered to fix the fees.    [338–339]

A decision by the Commissioner of Insurance made under G. L. c. 176B, § 4, as appearing in St. 1960, c. 307, § 1, after full hearing, merely stating that upon "consideration of all the evidence" he disapproved a schedule of fees to be paid by a medical service corporation to participating physicians, was insufficient to permit a proper review by the courts under § 12; the decision should have also indicated the standards applied and the supporting facts found.    [336, 339–340]

Statement of criteria to be observed by the Commissioner of Insurance in determining whether to approve or disapprove under G. L. c. 176B, § 4, as appearing in St. 1960, c. 307, § 1, a schedule of fees to be paid by a medical service corporation to participating physicians.    [340–341]

TWO PETITIONS filed in the Superior Court on July 28, 1961.
The cases were heard by *O'Connell, J.*

*Edmund L. Twomey* (*Herbert P. Wilkins* with him) for the petitioners.

*Leo Sontag,* Assistant Attorney General (*William A. Burke* with him), for the respondent.

WHITTEMORE, J.    These are appeals from final decrees in the Superior Court which dismissed the petitions of Massachusetts Medical Service (Blue Shield), a medical service corporation under G. L. c. 176B, and of a physician who practises surgery within the Commonwealth. The

---

[1] The companion case is by Lewis S. Pilcher against the same respondent.

petitions seek to revise an order of the Commissioner of Insurance which disapproved a filing by Blue Shield of a new schedule showing increases in fees for surgical services to "Plan B" subscribers, certain increased benefits available to subscribers, and certain increases in charges.

The order of the Commissioner, after a hearing and without a finding, recited: "after full consideration of all the evidence and under the authority conferred by [G. L.] c. 176B . . . I disapprove the filing made by Blue Shield dated June 9, 1961."

The petitions allege in substance that Blue Shield had introduced evidence before the Commissioner that the increased fees were reasonably required and that there had been no substantial evidence contradictory thereto. The judge in the Superior Court found that there was substantial evidence to support the order of the Commissioner. It is not contended that the increases to subscribers are unnecessary if the fees are increased. The issue before us is in respect of the proposed increases in surgical fees.

Blue Shield operates a nonprofit medical service plan under which it has an agreement with each participating physician by which the latter agrees to furnish medical and surgical services to subscribers and their covered dependents and to accept as full payment for his services to those subscribers who are entitled to "service benefits" the amount paid by Blue Shield. There is provision for payment of physicians on a pro rata basis in the event that, in any accounting period, Blue Shield funds are inadequate for full payment. A physician may terminate the agreement only by twelve months' notice.

The Blue Shield subscribers' certificate provides that a "service-benefit member" shall (with certain exceptions) not be subject to an additional charge by a participating physician. It defines a "service-benefit member" in respect of its two plans, "Plan A" and "Plan B." A service-benefit member is any subscriber without member dependents whose annual income is $2,000 or less under Plan A, or $5,000 or less under Plan B; either one of a family of two

members the annual income of which is $2,500 or less under Plan A, or $6,000 or less under Plan B; or any one of a family of three or more members, the combined annual income of which is $3,000 or less under Plan A, or $7,500 or less under Plan B.

The fees provided to be paid physicians under Plan A are substantially less than under Plan B. There was evidence that over ninety-nine per cent of the physicians in active practice in Massachusetts are participating physicians, that over fifty per cent of the people of the State are "covered by Blue Shield," and that about eighty-five per cent of the people[1] are eligible for service benefits.

Chapter 176B was inserted by St. 1941, c. 306. The preamble of that statute recites: "This act provides for the preservation of the public health by furnishing medical services at low cost to members of the public who become subscribers . . . ."

Under G. L. c. 176B, § 14, Blue Shield as a medical service corporation is a charitable corporation exempt from all provisions of the insurance laws of the Commonwealth except as provided in c. 176B, and its property "except as hereinafter provided . . . [is] exempt from all state and local taxes."

Section 4 of c. 176B (as appearing in St. 1960, c. 307, § 1) provides in part that: "The form of agreement with participating physicians . . . and the rates at which . . . [they] are compensated for their services to the subscribers or to covered dependents shall at all times be subject to the written approval of the commissioner. [¶] Any agreement between a medical service corporation and a person whereby such corporation undertakes to furnish benefits for medical service to said person and his covered dependents, if any, shall be considered a non-group medical service agreement. Under such an agreement the form of subscription certificate and the rates charged . . . shall be filed with and receive the prior approval of the commis-

---

[1] Blue Shield's brief asserts that this refers to the persons who are covered by Blue Shield.

sioner.    No such agreement shall be approved if he finds
that the benefits provided therein are unreasonable in rela-
tion to the rate charged, nor if the rates charged are exces-
sive, inadequate or unfairly discriminatory.''

Section 12 of c. 176B provides in part that: ''All deci-
sions and orders of the . . . commissioner made under any
provision of this chapter may be revised as justice and
equity may require upon a petition in equity filed . . . in
the superior court within and for the county of Suffolk by
any party aggrieved . . . [thereby].''

1.    We consider first the standard governing the Com-
missioner's approval of rates of compensation of physi-
cians.    The Blue Shield plan is designed to serve the pur-
pose of low cost medical service by furnishing insurance,
by doing so free of the burden of profit and taxes, and by
the commitment of participating physicians not to charge
to persons within certain income brackets more than the
scheduled fees approved by the Commissioner.

The public through the Commissioner is concerned that
the insurance plan be actuarily sound so that there will be
assets to meet liabilities; that the administrative plan and
costs be reasonable; and that rates to members be reason-
able.

Hence § 4 expressly provides that no subscriber's agree-
ment shall be approved if the Commissioner ''finds that the
benefits provided therein are unreasonable in relation to
the rate charged, nor if the rates charged are excessive, in-
adequate or unfairly discriminatory.''

The public concern in respect of these matters is further
protected by the requirement that the agreement with par-
ticipating physicians and the fee schedules be subject to the
Commissioner's approval.    In this way the Commissioner
may exercise some control over the principal cost item
underlying rates to members.    There is an interrelation
between the two paragraphs of § 4 which provide for ap-
proval by the Commissioner.    The standards expressed in
the second paragraph in respect of rates to members are
implicitly the standards to be applied by the Commissioner

under the first paragraph in determining the rates at which the physicians are to be compensated. See *Bay State Harness Horse Racing & Breeding Assn. Inc.* v. *State Racing Commn.* 342 Mass. 694, 699–700; G. L. c. 152, § 52; c. 174A, § 5 (a) 2; c. 175, § 113B; c. 175A, § 5 (a) 4.

It follows that the Commissioner may disapprove the fee schedule only if the fees are inadequate, excessive or unfairly discriminatory.

This, of course, does not give the Commissioner the power to fix the fees; he may not require that they be at the figures he finds reasonable. Necessarily there is a range of reasonableness and the statute permits disapproval only if the Commissioner finds the fees to be outside that range.

2. The statutory provision for revision of the Commissioner's decision makes it necessary that the grounds of his decision appear. What is called for in the Superior Court is review and not a retrial. *Ott* v. *Board of Registration in Medicine,* 276 Mass. 566, 571.

The statute does not expressly require a hearing before the Commissioner. There may be instances, as where certain new filings are approved, in which a hearing will not be necessary or advisable. We need not decide that. But here there was a disapproval of rates. The rate regulating function is administrative. It is appropriate, if not necessary, that there be by the administrator, rather than in court, the hearing in respect of rates which is necessary at some stage of the administrative-judicial process surely to meet constitutional requirements. *Clarke* v. *Board of Collegiate Authy.* 327 Mass. 279, 283. *Ohio Bell Tel. Co.* v. *Public Utils. Commn. of Ohio,* 301 U. S. 292, 304–305. *Morgan* v. *United States,* 298 U. S. 468, 479–480. Davis, Administrative Law, §§ 7.04, 7.10. Davis, The Requirement of a Trial-Type Hearing, 70 Harv. L. Rev. 193, 198–199. See *Worcester County Natl. Bank* v. *Commissioner of Banks,* 340 Mass. 695, 701.

There having been a hearing, appropriately, with testimony and statements, an opinion accompanying the decision is needed to disclose the facts relied on and the stand-

ard applied, and this is so whether or not the proceeding, because of constitutional requirements, is "adjudicatory."[1] We need not rule on that issue.

3. In determining whether rates are inadequate, excessive or unfairly discriminatory the Commissioner must apply criteria which are relevant to the purpose and effect of the statute.

We agree with the petitioners that prevailing charges in the community for like services are important measures. The fees of physicians apart from any plan, and their fees under other plans, are relevant. So are increased costs and expenses of physicians subsequent to the date of approval of existing fee schedules as well as increases in costs of living indices. Some weight may be given to the studies of the Blue Shield fee committee composed of representatives of each of the subspecialties in medicine and surgery and to their method of formulating the schedule and also to the views of such a group as the Council of the Massachusetts Medical Society.

We agree with the petitioners that the purpose of "low cost," expressed in the preamble to the statute, does not require that the fees be fixed at below prevailing rates. But it may be appropriate to take into consideration that the plan gives reasonable assurance of certainty and promptness of payment and minimum cost of collection. Also in so far as the plan embodies the intention to charge at a lower rate to persons of low income, as is certainly the case with Plan A rates, the basis of the differential would be presented for approval.

Facts and circumstances were referred to before the Commissioner in statements in opposition to the plan which are of slight relevance, if any, to the decision to be made under the statute.

---

[1] If the proceeding before the Commissioner was "adjudicatory" under G. L. c. 30A, § 1 (1), inserted by St. 1954, c. 681, § 1, that is, one "in which the legal rights, duties or privileges of specifically named persons are required by constitutional right or by any provision of the General Laws to be determined after opportunity for an agency hearing," "a statement of reasons . . . including determination of each issue of fact or law necessary to the decision" was required under G. L. c. 30A, § 11 (8).

It appears that the fee schedule under the plan determines the physicians' fees for a large part of the inhabitants of the Commonwealth. Included are employees of the Commonwealth and municipalities and private businesses. The rates doubtless have some effect on the general cost of living. Rates under this plan may affect rates under other plans and the cost of commercial medical expense insurance.

Those affected by an increase understandably ask disapproval because of the hardship to individuals and communities of increased costs and because of data indicating to them that the earnings of physicians are relatively high. The statute, however, does not contemplate that such factors be determinative. The plan is a voluntary one, both as to subscribers and physicians. As stated above, an intention to have the fees fixed by a public agency is not implied in the statute.

4. There was substantial uncontroverted evidence in support of an increase in the fee schedule and a paucity of substantial contrary evidence. The record shows that there has been no substantial change in surgical fees since 1950,[1] that the schedule is consistent with the Medical Schedule of fees by which the Federal government pays Massachusetts physicians for their services to dependent military personnel and with the Baker Memorial Hospital schedule used by the Massachusetts General Hospital and with the schedule of the Rhode Island Medical Society's Physicians Service Master Schedule of Indemnities and with the larger Blue Shield plans throughout the country. None of the rates exceeds those generally charged by participating physicians, and in a number of instances they are below such charges. The cost of medical service has increased since 1950 as has the cost of living. The proposed increases average about ten per cent. The increase in 1957 of the limits for service benefits under Plan B for both individuals

---

[1] The new fee schedule in 1957 raised the figures for some of the more difficult, less common procedures such as ''excision of brain tumor, excision of spinal cord tumor, [and] certain major heart operations.''

and families to $6,000 for families of two and $7,500 for families of three or more increased substantially the number of persons to whom the physicians could not charge more than Plan B rates.

For reasons stated this evidence was not affected by testimony or statements in respect of the average earnings of doctors, or the burden of increased medical costs to individuals, businesses, the Commonwealth and its municipalities. We have not analyzed with care the evidence in respect of cost of living indices.

5. The Commissioner's brief contends that the only statutory limit on the Commissioner's disapproval is that it be in the public interest. In the circumstances of this misconception it is inappropriate for us to search the record for testimony which, if given weight, might conceivably be ruled a basis, under the applicable statutory standards, for the Commissioner's adverse decision.

6. The decrees are reversed. Decrees are to enter in the Superior Court vacating the decision of the Commissioner and remanding the proceedings to the Commissioner for a decision under the standards indicated herein with a statement of the reasons therefor.

*So ordered.*