LIBERTY MUTUAL INSURANCE COMPANY & others *vs.*
COMMISSIONER OF INSURANCE.

Suffolk.    May 10, 1974. — July 17, 1974.

Present: TAURO, C.J., BRAUCHER, HENNESSEY, & KAPLAN, JJ.

*Insurance,* Rating, Workmen's compensation insurance. *Equity Plead-
ing and Practice,* Parties, Review of decision of Commissioner of
Insurance. *Statute,* Construction.

In a suit for review of a decision of the Commissioner of Insurance
disapproving revised workmen's compensation insurance rates filed
by the Massachusetts Workmen's Compensation Rating and In-
spection Bureau, it was held that under G. L. c. 152, § 52, as appearing
in St. 1947, c. 619, § 1, the Bureau was a "party aggrieved," entitled to
seek review of the Commissioner's decision. [36-37]
The Commissioner of Insurance under G. L. c. 152, § 52, does not have
the power to fix rates for workmen's compensation insurance, but he
may disapprove rates which are outside the range of reasonableness
and inadequate, excessive or unfairly discriminatory. [37-38, 42]
A decision by the Commissioner of Insurance, acting under G. L. c. 152,
§§ 52, 52C, disapproving workmen's compensation insurance rates
based on the "traditional method" of applying expense needs of
nonparticipating stock companies to all insurers even though the
expense needs of participating stock companies and mutual com-
panies were different, was within the Commissioner's authority and
must be affirmed on judicial review. [40-45]

BILL IN EQUITY filed in the Supreme Judicial Court for the
county of Suffolk on June 21, 1973.

The suit was reserved and reported by *Quirico, J.*

*Acheson H. Callaghan, Jr. (Jeffrey Swope* with him) for
Liberty Mutual Insurance Company & others.

*James P. Kiernan,* Assistant Attorney General, for the
Commissioner of Insurance.

*Sanford A. Kowal (Walter P. Muther* with him) for the
intervener, Associated Industries of Massachusetts.

BRAUCHER, J. Massachusetts Workmen's Compensation Rating and Inspection Bureau (Bureau) under G. L. c. 152, § 52, filed with the Commissioner of Insurance (Commissioner) revised workmen's compensation insurance rates to be effective on February 1, 1973. The filing followed a traditional method, used and approved for many years, in using expense data for "non-participating stock companies" to determine "manual rates" to be used by all insurers. After hearing, the Commissioner disapproved the filing on the ground that "the allowance for expenses . . . will be excessive for participating stock carriers and mutual carriers." The Bureau and numerous insurers sought judicial review, and a single justice of this court reserved and reported the case without decision. We direct the entry of a decree affirming the Commissioner's disapproval.

The Bureau is a voluntary unincorporated association licensed by the Commissioner as a rating organization under G. L. c. 152, § 52C. All companies writing workmen's compensation insurance in the Commonwealth — 178 in 1972 — are members or subscribers of the Bureau, and they authorized it to make the filing in question. The filing was made on December 15, 1972, and after lengthy hearings the Commissioner made his decision on June 1, 1973, disapproving the filing. A petition for review was filed on June 21, 1973, by the Bureau and twenty corporate insurers, including mutual companies, participating stock companies, and nonparticipating stock companies, as representatives of all 178 insurers. Boston Shipping Association and Associated Industries of Massachusetts (AIM) participated in the hearings and by stipulation were allowed to intervene in the review proceeding.

1. *Aggrieved parties.* The Commissioner contends that the Bureau is not a "party aggrieved," entitled to petition for review of the Commissioner's opinion under G. L. c. 152, § 52, and AIM contends that no one else is a "party aggrieved." No contention is now made that the Bureau, as an unincorporated association, lacks capacity to sue. Taken together, the contentions of the Commissioner and AIM

are obviously without merit and need not detain us long. We reject both contentions.

The Bureau, as "a rating organization licensed under section fifty-two C," was authorized by its members and subscribers to make the filing on their behalf. As an authorized rating organization, it properly participated in the proceedings before the Commissioner, and in similar cases no objection has been made to the participation of similar rating organizations in judicial review. *Insurance Rating Bd.* v. *Commissioner of Ins.* 358 Mass. 171, 172 (1970). *Aetna Cas. & Sur. Co.* v. *Commissioner of Ins.* 358 Mass. 272, 273 (1970). If as an unincorporated association it lacked capacity to seek judicial review, a question on which we express no opinion, it could do so in the form of a petition by one or more of its members and subscribers on behalf of the others, as was done in this case. *Insurance Rating Bd.* v. *Commissioner of Ins.* 359 Mass. 111, 112-113 (1971). Compare *McCormack* v. *Labor Relations Commn.* 358 Mass. 682, 684-685 (1971); Mass. R. Civ. P. Rule 23.2, effective July 1, 1974, 365 Mass. 769. Each company which authorized the filing was "the company" authorized to seek judicial review by G. L. c. 152, § 52. See *Westland Housing Corp.* v. *Commissioner of Ins.* 352 Mass. 374, 382 (1967). If any of these parties had lacked "standing," we should have been inclined to allow them to intervene or to argue as friends of the court. Compare *Cambridge Elec. Light Co.* v. *Department of Pub. Util.* 363 Mass. 474, 504 (1973).

2. *Authority for judicial review.* There seems to be some dispute whether this proceeding is subject to G. L. c. 152, § 52F (c), applicable to orders or decisions under the authority of §§ 52C-52F, as well as to § 52. The Commissioner may have caused the confusion. On its face his opinion simply disapproves a rate filing under § 52 and does not expressly make any order or decision under §§ 52C-52F, but it concludes by stating that review may be had under "provisions of G. L. c. 152, Sec. 52 and Sec. 52F." Since no party suggests that this question can affect the outcome in any way, we express no opinion on it. Compare

*Associated Indus. of Mass.* v. *Commissioner of Ins.* 356 Mass. 279, 285-286 (1969).

3. *The "traditional method."* According to the Commissioner, the Bureau determined the proposed rates by actuarial procedures which are essentially the same as have been used in Massachusetts for a number of years. Those procedures are complex, but we are primarily concerned only with one component, the "expense multiplier," designed to show "how much the otherwise adjusted loss costs expected have to be increased to produce the expense and profit need calculated." In this case the Bureau determined that 28.9% of premium was needed for expense other than "loss adjustment expense," and allowed 2.5% of premium for "profit and contingencies." The data relied on, according to the Commissioner, were reliable, but this does not imply that they have in all respects been properly used.

The allowance for expenses, in accordance with traditional practice, was based on the expected expense needs of nonparticipating stock companies. The expense experience of participating stock companies and mutual companies was different. For example, countrywide average figures for 1971 show that, for participating stock companies and mutual companies, expenses as a percentage of net premiums earned were materially less than those of nonparticipating stock companies, primarily because commission and brokerage expense was less. Countrywide commission and brokerage expense for 1971, as a percentage of net premiums earned, was as follows:

| | |
|---|---|
| Nonparticipating stock companies | 9.5% |
| Participating stock companies | 5.2% |
| Mutual companies | 1.8% |

It is not disputed that the reason is that stock companies sell insurance through agents more than mutual companies, which to a greater extent sell through employees.

It is stipulated that the Bureau was organized in 1915, that it has always filed a single set of manual rates on behalf of all its members and subscribers, and that successive

Commissioners have approved one set of manual rates for all members and subscribers of the Bureau. Since 1947 no decision of a Commisioner has directly considered or addressed itself to the question of using the expense experience of nonparticipating stock companies as a basis for rates of other companies. The differentials in countrywide expense ratios between nonparticipating stock companies and mutual companies and between nonparticipating stock companies and participating stock companies have always existed, although the size of the differentials has varied from year to year. The reported expense ratios of individual companies may vary from the countrywide averages.

The companies with lower expense needs pay dividends to policyholders. Indeed, since some groups of companies are classified as nonparticipating stock companies but include participating companies, ratios of dividends to policyholders as a percentage of net premiums earned are reported for all three categories. It is stipulated that the data for 1971 are representative of the dividends paid in recent years on workmen's compensation insurance in Massachusetts. The 1971 dividend ratios are as follows:

| | |
|---|---|
| Nonparticipating stock companies | 3.4% |
| Participating stock companies | 13.9% |
| Mutual companies | 13.8% |

The actual cost of insurance to the insured employer may be affected not only by dividends but also by premium discounts, additional premium charges, experience rating, and retrospective rating plans. The Commissioner has no authority to require companies to pay dividends, but he does approve the other modifications. Risks which develop less than $500 of annual premium are subject to additional premium charges. Risks which develop more than $750 of annual premium are subject to experience rating. Risks which develop more than $1,000 of annual premium are subject to graduated premium discounts which are greater for stock companies than for mutual companies. Thus only

a small fraction of all premiums are determined simply by applying "manual rates."

4. *The Commissioner's decision.* The Commissioner said that the traditional actuarial procedures "can be defined as a mixture of fact, estimate and fiction. And, as will be seen, it is the element of fiction in the procedure that is the cause for my greatest concern." His duty, he said, is to approve for "any company" classifications and rates that are "not excessive, inadequate or unfairly discriminatory for the risks to which they . . . apply," quoting G. L. c. 152, § 52. He quoted § 52C (f) (2),[1] authorizing the Bureau to use differing systems of expense provisions to reflect the requirements of the operating methods of a particular insurer or group of insurers, and said, "What the statute authorizes may be legally required in circumstances such as these where the evidence admittedly discloses that the proposed manual rates will be excessive for some insurers."

The Commissioner rejected the argument that allowances for fictitious expense are offset by dividends, stating that "the original rate charged the policyholder was excessive by anticipation. He is owed the return and more in as much as the excess funds have been put to work by the insurer at a further cost to him." Since "the traditional method . . . contemplates the approval of demonstrably excess rates for identified groups of insurers, . . . tradition is wrong as a matter of law. The evidence compels a finding that the allowance for expenses in the manual rates will be excessive for participating stock carriers and mutual carriers. The proposed rates will therefore be excessive for those carriers and cannot under the law be approved for them." To remedy the defect, amended rates may be filed, using the same data modified to define the specific expense needs of differing insurers or groups of insurers.

---

[1] "[T]he systems of expense provisions included in the rates for use by any insurer or group of insurers may differ from those of other insurers or groups of insurers to reflect the requirements of the operating methods of any such insurer or group of insurers."

Finally, according to the Commissioner, the distinction between nonparticipating and participating companies is not clearly drawn, and each carrier must show its category and its resulting expense needs.

5. *The governing statutes.* This case is directly subject to G. L. c. 152, § 52, as appearing in St. 1947, c. 619, § 1. That section, referring to insurance companies authorized to insure workmen's compensation benefits, provides that "any such company . . . shall file" with the Commissioner, or authorize a licensed rating organization to file with him on its behalf, "its classifications of risks and premiums relating thereto and subsequent proposed classifications or premiums, which shall not take effect until approved by said commissioner as not excessive, inadequate or unfairly discriminatory for the risks to which they respectively apply. . . . Said commissioner may withdraw his approval."

Section 52 must be read with § 52C, inserted by St. 1947, c. 619, § 2, which provides in successive subsections for (a) licensing of rating organizations, (b) review of their rules and regulations by the Commissioner, (c) prohibition of any rating organization rule "the effect of which would be to prohibit or regulate" dividends to policyholders, (d) authorization of coöperation among rating organizations and insurers, and review of coöperative activities and practices by the Commissioner, (e) examination of rating organizations by the Commissioner, (f) factors to be considered in making rates, and (g) freedom of contract with respect to commissions, brokerage, and compensation of employees. Of particular importance here are § 52C (d) and (f), set forth in pertinent part in the margin.[2]

We have considered § 52 infrequently. See *Massachusetts Medical Serv.* v. *Commissioner of Ins.* 344 Mass. 335,

---

[2] "(*d*) Co-operation among rating organizations or among rating organizations and insurers in rate making or in other matters within the scope of this chapter is hereby authorized, provided the filings resulting from such co-operation are subject to all the provisions of this chapter which are applicable to filings generally. The commissioner may review such co-operative activities and practices and if, after due notice and a hearing, he finds that any such activity or practice is unfair or unreasonable or otherwise inconsistent with this section, he

339 (1962); *Westland Housing Corp.* v. *Commissioner of Ins.* 352 Mass. 374, 381-384 (1967); *Associated Indus. of Mass.* v. *Commissioner of Ins.* 356 Mass. 279, 283-286 (1969). The standards to be applied by the Commissioner in approving rates are similar to those in other insurance statutes. E.g., G. L. c. 174A, § 5 (a) (2); c. 175, § 113B; c. 175A, § 5 (a) (4); c. 176A, § 6; c. 176B, § 4. Unlike some other statutes, § 52 does not in terms authorize the Commissioner to "fix and establish" rates, but it does require his approval before they take effect. Contrary to the contention of AIM, we think he may disapprove rates or withdraw his approval only if rates are inadequate, excessive or unfairly discriminatory. He does not have power to fix rates; "he may not require that they be at the figures he finds reasonable. Necessarily there is a range of reasonableness and the statute permits disapproval only if the Commissioner finds" the rates "to be outside that range." *Massachusetts Medical Serv.* v. *Commissioner of Ins., supra,* at 339. The burden of furnishing evidence to enable the Commissioner to establish a range of reasonableness is on the insurers. *Massachusetts Medical Serv.* v. *Commissioner of Ins.* 346 Mass. 346, 348 (1963). *Travelers Indem. Co.* v. *Commissioner of Ins.* 362 Mass. 301, 305 (1972).

We have not previously considered the effect of § 52C. "The commissioner, as we have recognized, has been given very broad supervisory powers over insurance companies." *Rockland Mut. Ins. Co.* v. *Commissioner of Ins.* 360 Mass. 667, 672 (1971). *Gordon* v. *Hardware Mut. Cas. Co.* 361 Mass. 582, 584 (1972). We construe the statutes as "an harmonious whole" in the light of their dominant purposes. See *Rose* v. *Board of Review in the Div. of Ins.* 346 Mass.

---

may issue a written order . . . requiring the discontinuance of such activity or practice."

"(*f*) All rates shall be made in accordance with the following provisions: — (1) Due consideration shall be given . . . to a reasonable margin for underwriting profit and contingencies, to dividends . . . to . . . policyholders . . . and to past and prospective expenses both countrywide and those specially applicable to this commonwealth, and to all other relevant factors within and outside this commonwealth; (2) [see fn. 1]."

581, 585 (1964). So construed, we think they permit the Commissioner in approving rates under § 52 to exercise his powers under § 52C (d) and to take into account the factors which § 52C (f) directs the Bureau to consider in making rates.

On their face the statutes do not require the Commissioner to approve rates for participating companies on the basis of the expense needs of nonparticipating companies, once it is shown that the expense needs are greater for nonparticipating companies than for participating companies. Nor do they require the Commissioner to rule as matter of law that due consideration of dividends to policyholders requires an allowance for dividends by participating companies equal to the difference between their expense needs and those of participating companies. Reading the statutes on their face, we think it was open to the Commissioner to rule, as he did, that rates for one group of companies based on the greater expense needs of another group of companies did not show due consideration to the lower expenses of the first group. He could therefore find that the coöperative filing was inconsistent with § 52C (f) (1) and that it had not been shown that the filed rates were not excessive, and could refuse to approve them.

6. *Legislative history and administrative practice.* The insurers contend that the legislative history of the statutes shows that their principal object was to permit the existing diversity among the companies to continue, to guarantee to each group of insurers the right to employ systems of expense provisions reflecting its operating methods, and to guarantee that the rate regulatory laws would not be used to favor one type of operation over another. The companies, it is argued, were given the unqualified right to file rates based on the needs of their own particular operating methods. Since mutual companies typically charged the same initial rates as stock companies and reflected expense savings in dividends, the Legislature contemplated the continuance of that practice. The practice continued and was approved by successive Commis-

sioners after the 1947 revision of the governing statutes, the argument continues, and it cannot now be changed without new legislation.

We accept the insurers' account of the history. The practice of mutual companies of charging the same premiums as stock companies, returning any excess as dividends, is of long standing. See *Penn Mut. Life Ins. Co.* v. *Lederer,* 252 U. S. 523, 525 (1920); *White Fuel Corp.* v. *Liberty Mut. Ins. Co.* 313 Mass. 165, 168 (1943). After the decision in *United States* v. *South-Eastern Underwriters Assn.* 322 U. S. 533 (1944), the States, pursuant to Congressional authorization, enacted legislation designed to preserve traditional patterns by substituting State regulation for regulation under the Federal anti-trust laws. See 1947 Senate Doc. No. 610; *Insurance Co. of No. America* v. *Commissioner of Ins.* 327 Mass. 745, 747-748 (1951); *Multi-Line Ins. Rating Bureau* v. *Commissioner of Ins.* 357 Mass. 19, 21-22 (1970); *Insurance Rating Bd.* v. *Commissioner of Ins.* 358 Mass. 171, 177-178 (1970); Gardner, Insurance and the Anti-Trust Laws — A Problem in Synthesis, 61 Harv. L. Rev. 246, 249-259 (1948); Symposium, Regulation of Insurance, 15 Law & Contemp. Prob. 471 (1950).

We think that history demonstrates that the Commissioner is wrong in so far as he asserts that the governing statutes *require* him to change the traditional method of making workmen's compensation insurance rates. But it was essential to the scheme of the 1947 legislation that he be given authority to regulate the insurance practices in question, and he was given that authority. In his discretion he could find that due consideration of dividends, in view of long practice, could take the form of an allowance to mutual companies for fictitious expenses. But he was not required so to find; he also had discretion to determine that the historic practice was unreasonable or otherwise contrary to § 52C and should be replaced by direct consideration of dividends. *Mutual Ins. Rating Bureau* v. *Williams,* 189 So. 2d 389, 392 (Ct. App. Fla. 1966), cert. den. 196 So. 2d 922 (Fla. 1967), app. dism. 201 So. 2d 228 (Fla. 1967). On such matters we are not authorized to substitute

our judgment for that of the Commissioner. *Massachusetts Bonding & Ins. Co.* v. *Commissioner of Ins.* 329 Mass. 265, 273 (1952). Compare *Federal Power Commn.* v. *Texaco Inc.* 417 U. S. 380, 388-390 (1974).

7. *Due consideration of dividends.* The insurers contend that the Commissioner's decision is inconsistent with the requirement that due consideration be given to dividends to policyholders. The Commissioner responds that the profit factor of 2.5% in the proposed rates reflects due consideration of dividends. Both contentions are accompanied by arguments as to the effect of the decision on competition among insurers. Since the Commissioner made no findings on these matters, we are not required to address them on the present record. We do not purport to rule on the adequacy of the 2.5% factor for any category of company. Nor, in the absence of any showing of a factual basis for the argument, do we rule on the insurers' contention that the decision may adversely affect newly established mutual companies.

8. A final decree is to be entered in the county court affirming the decision of the Commissioner.

*So ordered.*