JAMES P. KARTELL & others[1] *vs.* BLUE SHIELD OF MASSACHUSETTS, INC. & others.[2]

Suffolk.  May 7, 1981. — August 20, 1981.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, & NOLAN, JJ.

*Medical Service Corporation. Administrative Law,* Primary jurisdiction. *Insurance,* Commissioner of Insurance.

In considering questions certified by a judge of the United States District Court for the District of Massachusetts in an action by certain physicians against Blue Shield of Massachusetts, Inc., and Blue Cross of Massachusetts, Inc., this court declined to invoke the doctrine of primary jurisdiction to refer the questions to the Commissioner of Insurance for his determination where the certified questions involved matters of law and the application of principles of statutory construction and presented no unresolved factual issues. [412-414]

There is nothing in the broadly stated purpose of G. L. c. 176B or in the comprehensive regulatory power of the Commissioner of Insurance under c. 176B from which may be inferred a State policy requiring, or authorizing the Commissioner to require, that physicians who have signed agreements for services to subscribers of Blue Shield of Massachusetts, Inc., accept the fee paid by Blue Shield as payment in full for covered services. [414-423]

General Laws c. 176B, § 7, precludes payments by Blue Shield of Massachusetts, Inc., to physicians who have not signed Participating Agreements with Blue Shield for services rendered to subscribers except in cases of emergency or when services are rendered outside the State. [423-425]

Blue Cross of Massachusetts, Inc., is not empowered under G. L. c. 176A to make payments to subscribers or physicians for physicians' services [426-427], although it is permitted by c. 32A, § 4, to contract with the Group Insurance Commission to make payments for such services rendered to State employees [427].

---

[1] Kartell is joined by three other Massachusetts physicians as parties plaintiff.

[2] The second named defendant is Blue Cross of Massachusetts, Inc. The Commissioner of Insurance has intervened as a party defendant.

QUESTIONS OF LAW certified to the Supreme Judicial Court by the United States District Court for the District of Massachusetts.

*James van R. Springer* of the District of Columbia (*Stanley V. Ragalevsky* with him) for the plaintiffs.

*Daniel O. Mahoney* (*Reginald H. Howe* with him) for Blue Shield of Massachusetts & another.

*Paul W. Johnson,* Assistant Attorney General, for Commissioner of Insurance, intervener.

NOLAN, J. On January 16, 1981, a judge of the United States District Court for the District of Massachusetts certified to this court two questions relating to a private antitrust action now pending in the Federal court. The questions are as follows:

"1. Is Blue Shield of Massachusetts, Inc. compelled by M.G.L. c. 176B, § 7 or any other Massachusetts statute or required by any clearly articulated and affirmatively expressed State policy (a) to limit fees of participating physicians as described in the annexed Stipulation and (b) to refuse to make payment for non-emergency services provided in Massachusetts by physicians who decline to accept the terms imposed by Blue Shield in their participation agreement, including such limitation of fees?

"2. Is Blue Cross of Massachusetts, Inc. permitted generally under the Massachusetts statutes to make payments to subscribers or physicians for medical services provided by physicians to Blue Cross-Blue Shield subscribers, as it does under its contract insuring employees of the Commonwealth?" For the reasons which follow, we answer question 1(a) and 2 in the negative. We answer question 1(b) in the affirmative.

I. *Background.*

The plaintiffs, four Massachusetts physicians, seek injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26 (1976), against certain practices of the defendants, Blue Shield of Massachusetts, Inc. (Blue Shield), and Blue Cross of Massachusetts, Inc. (Blue Cross), which are alleged to operate in restraint of trade in violation of §§ 1 and 2 of

the Sherman Act, 15 U.S.C. §§ 1 and 2 (1976). Specifically, the plaintiffs allege that a) by refusing to reimburse physicians who have not signed Participating Physician's Agreements with Blue Shield for services to subscribers, except in emergencies or for services rendered outside Massachusetts, and b) by requiring that participating physicians accept Blue Shield's reimbursement as payment in full in most cases, Blue Shield is engaged in unlawful price setting. The plaintiffs further allege that Blue Cross has conspired with Blue Shield in refusing to provide benefits for physicians' services other than those rendered by the salaried staff of institutional providers such as hospitals and those rendered under Blue Cross's contract covering State employees, thereby perpetuating Blue Shield's alleged dominance in the market for physicians' services.

The defendants raised the defense that the challenged practices are immune from Federal antitrust attack under the "state action" exemption recognized in *Parker* v. *Brown*, 317 U.S. 341 (1943), and most recently articulated in *California Retail Liquor Dealers Ass'n* v. *Midcal Aluminum, Inc.*, 445 U.S. 97 (1980). This contention was supported by the Commissioner of Insurance (Commissioner) and initially accepted by the trial judge, who in August, 1978, ordered the complaint dismissed. On appeal, however, the United States Court of Appeals for the First Circuit reversed, holding that the questions of statutory construction raised by the State action defense should initially be determined by the State courts. *Kartell* v. *Blue Shield of Mass., Inc.*, 592 F.2d 1191 (1st Cir. 1979). The Court of Appeals accordingly directed the District Court to abstain pending our decision in *Nelson* v. *Blue Shield of Mass., Inc.*, 377 Mass. 746 (1979), and, if sufficient guidance was not provided by that decision, to consider certifying questions to this court. *Kartell* v. *Blue Shield of Mass., Inc.*, *supra* at 1195. After determining that the *Nelson* decision did not speak to the central statutory issues raised by the instant case, the trial judge proceeded with this certification. The materials before us include the briefs

of the parties, including the Commissioner, a stipulation of facts accompanied by a documentary appendix, and certain materials developed during the discovery phase of the Federal litigation.

II. *Primary Jurisdiction.*

As a threshold matter, the defendants invoke the doctrine of primary jurisdiction, and urge that we refer both certified questions to the Commissioner of Insurance for his formal consideration. We decline to do so.

The doctrine of primary jurisdiction permits a court to refrain from exercising its jurisdiction until an administrative agency has determined some question or some aspect of a question arising in the proceeding before that court. 3 K.C. Davis, Administrative Law § 19.01, at 3 (1958). See *Murphy* v. *Administrator of the Div. of Personnel Administration*, 377 Mass. 217, 220-222 (1979). A court will apply the doctrine to promote uniformity of regulation and to take advantage of an agency's special expertise. *Mashpee Tribe* v. *New Seabury Corp.*, 592 F.2d 575, 580 (1st Cir. 1979). See *Nader* v. *Allegheny Airlines, Inc.*, 426 U.S. 290, 303-304 (1976). In antitrust cases, the doctrine of primary jurisdiction may provide a means of accommodating Federal antitrust policy to an agency's regulatory policy. 3 K.C. Davis, Administrative Law § 19.05, at 26 (1958). See *Ricci* v. *Chicago Mercantile Exchange*, 409 U.S. 289 (1973); Jaffe, Primary Jurisdiction, 77 Harv. L. Rev. 1037, 1069-1070 (1964). Its use in a given case, however, rests in the sound discretion of the trial judge. *Lehman Bros.* v. *Schein*, 416 U.S. 386, 391 (1974).

In the instant case, the judge who certified questions of law to this court has already considered the applicability of the doctrine of primary jurisdiction. He rejected the defendants' comparison of the allegations in this case with those in *Nelson* v. *Blue Shield of Mass., Inc., supra,* where we applied the doctrine to dismiss a complaint alleging that certain of Blue Shield's practices, regulated by the Commissioner, violated State law provisions which are enforced in the first instance by the Commissioner. The judge con-

cluded that in the instant case "[t]he threshold question . . . is purely one of state statutory construction; no fact-finding, administrative proceedings are necessary or even relevant." Because we agree with the statement, we need not reach the question whether, under our Uniform Certification of Questions of Law rule, S.J.C. Rule 1:03, as appearing in 382 Mass. 700 (1981), we possess the power to refer certified questions to an agency for its consideration, especially when the Federal trial court has already refused to do so. See *SDK Medical Computer Servs. Corp.* v. *Professional Operating Management Group, Inc.*, 371 Mass. 117, 126-127 (1976), which held that, although it is possible that certain charges as to unfair competitive practices by Blue Shield should be initially referred to the Commissioner of Insurance for correction under his administrative authority, the matter is one for consideration by the trial court. But see *Kartell* v. *Blue Shield of Mass., Inc.*, 592 F.2d 1191, 1196 (1st Cir. 1979) (Coffin, C.J., dubitante) ("[I]f, in the process of considering the questions certified the Massachusetts court finds the record to be inadequate, I would see no reason why it could not require the record to be supplemented as might be necessary").

We find the first rationale supporting primary jurisdiction — the promotion of uniformity and consistency in the regulation of business entrusted to a particular agency — to be unimportant here. The danger of inconsistency present where, for example, various Federal courts construe the provisions of Federal regulatory statutes, is absent in our construction of State law as it applies to a State agency.[3] See Comment, Confusion of Exhaustion of Administrative

---

[3] In this regard, we note that courts disagree on the question whether referral from a Federal court to a State agency under the primary jurisdiction doctrine is ever appropriate in State action analysis. Contrast *Litton Sys., Inc.* v. *Southwestern Bell Tel. Co.*, 539 F.2d 418, 421 (5th Cir. 1976), with *Industrial Communications Sys., Inc.* v. *Pacific Tel. & Tel. Co.*, 505 F.2d 152 (9th Cir. 1974). See Note, *Parker* v. *Brown* Revisited: The State Action Doctrine Under Goldfarb, Cantor, and Bates, 77 Colum. L. Rev. 898, 925-928 (1977).

Remedies and Primary Jurisdiction Doctrines, 7 Suffolk U.L.Rev. 124, 138-139 (1972).

As to the second rationale supporting the use of primary jurisdiction — reliance on an agency's special expertise, especially with respect to issues involving technical questions of fact — we perceive no lack in the voluminous record before us which could be remedied by any kind of administrative proceeding. The certified questions before us involve questions of law and the application of principles of statutory construction. We agree with the District Court that, in this regard, *Nelson* v. *Blue Shield of Mass., Inc., supra,* is distinguishable. That case involved, among other questions, consideration of the frequency with which Blue Shield's board had been convened, the adequacy of its staff, its technical competence, and the efficiency of its procedures. *Id.* at 753. Such factual questions underlay what amounted to "an attack on the entire system by which Blue Shield compensates participating physicians." *Id.* The certified questions before us, while potentially having a broad impact on the Blue Cross-Blue Shield insurance system, present no such unresolved issues of fact, nor do they involve any claimed violation of the statutes administered by the Commissioner. Accordingly, we see no need to refer to the Commissioner any aspect of the questions certified.

III. *Restriction on "Balance Billing."*

The parties have stipulated that, at present, approximately 96 per cent of all Blue Shield subscribers are covered by "service benefit" contracts, under which a participating physician is required to accept the fee paid by Blue Shield as payment in full for covered services. Thus, only about 4 per cent of subscribers may be billed directly by participating physicians for amounts in addition to Blue Shield's approved rate, or "balance billed", as the plaintiffs term it. The defendants, conceding that no provision of G. L. c. 176B specifically orders this restriction, argue that the statutory purpose of providing low cost medical care, coupled with the Commissioner's regulatory actions in furtherance of that purpose, are together sufficient to insulate the restriction

from Federal antitrust attack. We disagree. Assuming, as we must, that the challenged practice operates to restrain competition in contravention of Federal antitrust law, we find in G. L. c. 176B no affirmative policy requiring, or authorizing the Commissioner to require, such a restraint. We therefore answer question 1(a) in the negative.

The restriction on balance billing is a product of two features of the Blue Shield system. Under the Participating Physician's Agreement presently in use, participating physicians are contractually obligated to accept Blue Shield's fees as payment in full for services rendered to members who are covered by service benefit, as opposed to indemnity benefit, contracts. Historically, as is explained in greater detail later in this opinion, service benefits were available only to subscribers who came within approved income limits. With the advent in 1968 of the "usual and customary charge" method of compensation, however, service benefits were for the first time provided to many subscribers without regard to their income. This development is the focal point of the State action controversy, and we explore it in some detail below.

Blue Shield was incorporated on May 6, 1942, under the name Massachusetts Medical Service. It was the first and remains the only medical service corporation organized under G. L. c. 176B. On September 18, 1942, the Commissioner gave his approval to the first subscription contract, Participating Physician's Agreement, schedule of rates to be charged subscribers, and schedule of fees to be paid participating physicians. The Participating Physician's Agreement, which remains unchanged to the present day, provides that "[t]he Participating Physician agrees to accept as full compensation for all . . . services such payments as are received from the Corporation . . . except in the case of those persons who are entitled only to Limited Indemnification, in which case the physician may make his customary charge to the patient for his services, crediting against such charge the amount set forth for such services in the fee schedule in effect at the time the services are rendered."

The original subscription certificate established two classes of subscribers, "limited" and "unlimited". An unlimited subscriber was one whose annual income was less than a certain amount on file with the Commissioner, a limited subscriber was one whose income exceeded that amount. Income limits were reviewed periodically, and revised to reflect general increases in wages. In 1951, Blue Shield implemented a second plan, known as Plan "B", to supplement the original plan, which was known as Plan "A". Under Plan "B", a single income limit of $5,000 was set for the subscriber and covered dependents; Plan "A" retained separate limits of $2,000 for an individual, $2,500 for families of two, and $3,000 for families of three or more. Plan "B" imposed higher subscription rates and paid higher fees for doctors; essentially, it provided the option of more comprehensive coverage, particularly for higher income subscribers, but did not otherwise depart from the basic precedent of Plan "A".

In 1956, Blue Shield and Blue Cross jointly initiated the Master Medical Certificate, providing comprehensive coverage of hospital and medical costs under a single plan. As with Plan "B", however, there was no departure from the income limit method of determining a subscriber's entitlement to service benefits.

By the late 1960's, there was pervasive dissatisfaction among participating phsyicians with Blue Shield's fees, and particularly with fees received under service benefit contracts. See, e.g., Proceedings of the Massachusetts Medical Society, May 16, 1967. In response to the complaints of participating physicians, Blue Shield in late 1967 or early 1968 filed with the Commissioner a proposed revision of the Master Medical Certificate accompanied by a proposed "Amended Schedule of Benefits — Blue Shield Portion of the Blue Cross — Blue Shield Master Medical Certificate" (1968 Amended Schedule of Benefits). This filing introduced the usual and customary charge method of compensation. Blue Shield proposed to substitute for fixed fee schedules a system under which participating physicians

would receive 95 per cent of the lesser of their usual charge, or the customary charge, for a particular service. The usual charge is calculated by determining the median of all fees charged by a particular physician for a specific service during each six-month reporting period. Similarly, the customary charge is established as the mean of all fees reported for a particular service by physicians of like experience and training during each reporting period.

The advantage to participating physicians in this method of calculating fees lay in the promise of higher fees immediately for many services and relatively automatic future adjustments for inflation. Its benefit to consumers was that, for the first time, participating physicians would be bound to accept Blue Shield's fees as payment in full for covered services regardless of a subscriber's income. When the method was first proposed in 1968, it was to be implemented only for group accounts under the Master Medical Certificate and for Blue Shield's coverage of the Federal Employees program.[4] At present, however, it is applied to all Blue Shield accounts except the few remaining Plan "B" subscribers.

The revisions to the Master Medical Certificate and the 1968 Amended Schedule of Benefits were approved by the Commissioner effective February 1, 1968. From 1970 until 1975, Blue Shield updated usual and customary charges as it deemed appropriate without objection from the Commissioner. In 1976, Blue Shield deferred any update due primarily to a decrease in its reserves from $26 million to $1 million during the eighteen months preceding April 30, 1976. On March 1, 1977, the financial condition of the corporation having improved, Blue Shield filed an amended schedule of benefits. On April 15, 1977, the amended schedule of benefits was approved by the Commissioner subject to the condition that for the 1977 update, "the usual fees and the normal customary fees shall not exceed increases of 107%

---

[4] The parties offer no estimate of the percentage increase in service benefits at the time this method was instituted.

and 104% respectively, of those fees implemented in July,
1975."[5] In 1978, the Commissioner took the position that
any update of usual and customary charges was subject to
his prior written approval. A revision to the amended
schedule of benefits was filed in 1978 and received prelimi-
nary approval, but, following a change in administrations,
that approval was rescinded. Accordingly, the 1977
schedule of benefits has remained effective to the present.

The defendants argue that in exercising his power of ap-
proval over methods of compensation to achieve the
statutory purpose of providing low cost medical care to the
public, the Commissioner exerts sufficient control over Blue
Shield that the present methods of compensation, and the
concomitant limitations on physicians' fees, must be con-
sidered to be compelled by a "clearly articulated and af-
firmatively expressed state policy." There is no simple
definition of the degree of State compulsion which will suf-
fice to constitute State action for antitrust purposes. Several
of the United States Supreme Court's decisions in which
such a policy was found dealt with State schemes with an
avowed purpose to restrain competition. See, e.g., *Califor-
nia Retail Liquor Dealers Ass'n* v. *Midcal Aluminum, Inc.*,
445 U.S. 97 (1980); *Bates* v. *State Bar*, 433 U.S. 350 (1977);
*Parker* v. *Brown*, 317 U.S. 341 (1943). In this case, how-
ever, we are asked to infer such a policy from the broadly
stated purpose of G. L. c. 176B and the comprehensive
regulatory power of the Commissioner under the statute.

The Supreme Court dealt with an analogous, although
not identical, contention in *Cantor* v. *Detroit Edison Co.*,
428 U.S. 579 (1976). There, a retail pharmacist engaged in
marketing light bulbs brought suit to enjoin an electric utili-

---

[5] The 1977 amended schedule of benefits was later challenged in a pro-
ceeding instituted by several physicians and the Massachusetts Medical
Society. The suit was ultimately dismissed on the ground that the plain-
tiffs had failed to exhaust their administrative remedies. See *Nelson* v.
*Blue Shield of Mass., Inc.*, 377 Mass. 746 (1979).

ty company from distributing to its customers, with no separate charge, approximately fifty per cent of the most commonly used light bulbs. The cost to the utility of maintaining this program was approved by the State public utility commission as one aspect of the tariffs filed by the utility.

The Court formulated the issue tendered in terms of whether "the *Parker* rationale immunizes private action which has been approved by a State and which must be continued while the state approval remains effective." *Id.* at 581. Reversing the United States Court of Appeals for the Sixth Circuit, the Court held that the State's regulatory approval was insufficient to invoke the *Parker* immunity. In its analysis of the case, the Court offered two possible rationales for holding private conduct immune from Federal antitrust attack. First, it noted the potential injustice of holding a private actor liable for simply "[obeying] the command of his state sovereign"; second, the Court suggested that "if the State is already regulating an area of the economy, it is arguable that Congress did not intend to superimpose the antitrust laws as an additional, and perhaps conflicting, regulatory mechanism." *Id.* at 592.

The Court then noted that where the option to initiate the challenged program lay primarily in the private actor's hands, there was no inherent injustice in requiring that the utility conform its conduct to Federal law. *Id.* at 594. Second, and perhaps of more significance to the instant case, the Court found "no logical inconsistency between requiring [the utility] to meet [State] regulatory criteria in so far as it is exercising its natural monopoly powers and also to comply with antitrust standards to the extent that it engages in business activity in competitive areas of the economy." *Id.* at 596. Thus, where the State's regulatory interest could not be considered to extend to the market in light bulbs, the possibility of Federal and State policy conflict was absent. *Id.* at 584-585, 596; see *Bates* v. *State Bar, supra* at 361; *Lafayette* v. *Louisiana Power & Light Co.,* 435 U.S. 389, 419 (1978) (emphasizing the importance of a clearly and affirmatively expressed State policy "requiring the anti-

competitive restraint as part of a comprehensive regulatory system").

In deciding whether Blue Shield's current methods of compensation are compelled by State policy, we understand that we are to look to at least the following factors: any indication that in enacting G. L. c. 176B the Legislature sought to restrain competition in the market for physicians' services; the nature of and extent of the Commissioner's regulatory powers; and the degree to which any State interests involved could be accommodated by a method of compensation with a lesser effect on competition. See, e.g., *Sound, Inc.* v. *American Tel. & Tel. Co.,* 631 F.2d 1324, 1334 (8th Cir. 1980); *George R. Whitten, Jr., Inc.* v. *Paddock Pool Builders, Inc.,* 424 F.2d 25, 30 (1st Cir. 1970). We conclude that, under this analysis, Blue Shield's current method of compensation is not required by any express State policy.

First, to the extent that the Legislature, in enacting G. L. c. 176B, was concerned at all with the market in physicians' services, that concern appears to have been limited to providing a means whereby persons of average and low income could obtain otherwise unaffordable medical care. The clearest indication of this limited purpose is the fact that for the first twenty-six years of its operation, Blue Shield limited service benefits, with the Commissioner's approval, to subscribers who met certain income requirements. It is apparent that neither Blue Shield nor the Commissioner during this period believed that G. L. c. 176B required the extension of service benefits beyond this population.

This limited view of the purpose of G. L. c. 176B is supported by other materials which, while they do not constitute formal legislative history, nevertheless shed light on the contemporary understanding of the Blue Shield program. We have previously relied on such materials in determining legislative intent. See *Pereira* v. *New England LNG Co.,* 364 Mass. 109, 115 (1973).

The draft legislation which was enacted as G. L. c. 176B was introduced by the Massachusetts Medical Society. After

its introduction, the Medical Society observed in its official journal that the legislation was "submitted as evidence of a sincere effort on the part of the Massachusetts Medical Society to meet the present-day problems of low-income groups in regard to paying for medical care." Medical Service Corporations, 224 New England J. Med., No. 3, 124 (1941). In 1962, the Legislature empanelled a "Special Commission to Investigate and Study the Laws relative to Non-Profit Hospital and Medical Service Corporations, and the Rising Cost of Hospital and Medical Care and Hospital Accommodations" (Special Commission); the Special Commission's Final Report was filed in 1964. See 1964 Senate Doc. No. 958. The Special Commission specifically noted that both service and indemnity benefits were contemplated under G. L. c. 176B, and linked the provision of service benefits to Blue Shield's corporate purpose. "Simply stated, the fundamental purpose of . . . Blue Shield is to make available at the lowest possible premium cost, to the average and below average income citizen . . . a plan whereby the medical and surgical needs of himself and his family would be paid for in full at the time of such need." *Id.* at 142. See also *id.* at 182 (recommending that "the service-benefit features of Blue Shield contracts be retained in order to retain its purpose of serving the average and below average income subscribers"). While the Special Commission's report cannot be taken as an indication of original legislative intent, it does reflect the contemporary understanding of the underlying purposes of Blue Shield. The conclusion is inescapable that no one familiar with the legislative scheme, either at its inception or immediately prior to the adoption of the present method of compensation, believed that it required the near universal provision of service benefits which is now subject to challenge.

The second dimension to the defendants' State action argument is that G. L. c. 176B gives the Commissioner pervasive regulatory powers over Blue Shield, and that since 1968 he has exercised those powers to compel the extension of service benefits at their present level. Our review of the

Commissioner's powers convinces us that his approval of the usual and customary method of compensation does not constitute State action for the purposes of antitrust immunity. In *Nelson* v. *Blue Shield of Mass., Inc.,* 377 Mass. 746, 750 (1979), we held that "G. L. c. 176B establishes a comprehensive scheme for the public supervision of medical service corporations." In support of this conclusion, we noted the Commissioner's power of approval over Blue Shield's articles of organization (§ 2), by-laws (§ 3), "the form of its agreements with participating providers and its methods of compensating them (§ 4)," as well as the certificates issued to, and the rates charged, subscribers (§§ 4, 6). *Id.*

By G. L. c. 176B, § 4, the Commissioner is specifically required to approve in writing Blue Shield's "methods of compensating" providers. This language was inserted by St. 1968, c. 432, § 9; prior to this amendment, § 4 required the Commissioner to approve Blue Shield's "rates" of compensation. Under the prior law, we noted that because physician fee schedules are the primary determinants of the rates charged to Blue Shield's subscribers, the express standards governing the Commissioner's approval of rates to subscribers "are implicitly the standards to be applied by the Commissioner . . . in determining the rates at which the physicians are to be compensated. . . . It follows that the Commissioner may disapprove the fee schedule only if the fees are inadequate, excessive or unfairly discriminatory." *Massachusetts Medical Serv.* v. *Commissioner of Ins.,* 344 Mass. 335, 338-339 (1962). There is no reason to think that the substitution, in 1968, of the word "methods" for the word "rates" implied any change in the Commissioner's role under § 4. Thus, following our analysis in *Massachusetts Medical Serv.* v. *Commissioner of Ins., supra* at 339, we think that the present § 4 does not give the Commissioner power to establish Blue Shield's methods of compensation, but only to disapprove them if they are outside the "range of reasonableness." Cf. *Hathaway* v. *Commissioner of Ins.,* 379 Mass. 551, 554 (1980). (St. 1968, c. 432, § 9, indicates no intention to have physicians' fees fixed by the Commissioner.)

The above analysis leads us to the conclusion that although the usual and customary charge method of compensation may represent a reasonable accommodation of the various interests involved in establishing Blue Shield's rates of reimbursement to participating physicians, it is only one among a range of methods that the Commissioner would be required to approve. At least to the extent that it goes beyond the statutory policy of providing service benefits to low income subscribers, it cannot be said to be required by the State. Cf. *Cantor* v. *Detroit Edison Co.*, *supra*, at 584-585.

IV. *Limitation on Payments to Nonparticipating Physicians.*

By contrast to question 1(a), question 1(b) involves a relatively straightforward process of statutory construction. We agree with the defendants that G. L. c. 176B, § 7, precludes payments by Blue Shield to nonparticipating physicians for services rendered to subscribers except in cases of emergency or for services rendered outside the State.

General Laws. c. 176B, § 7, as appearing in St. 1978, c. 574, § 3, provides in relevant part that "[a] *subscriber or a covered dependent,* subject to the by-laws, rules and regulations of a medical service corporation and the terms and provisions of his subscription certificate, *shall be entitled to the benefits of this chapter upon receiving medical . . . service from any participating physician . . . or,* in the discretion of the corporation, *upon receiving medical . . . service from any non-participating physician . . . in an emergency or when outside the commonwealth*" (emphasis added). A nonprofit medical service plan is defined by G. L. c. 176B, § 1, as "a plan operated by a medical service corporation . . . whereby the cost of medical . . . service . . . furnished to subscribers and covered dependents is paid by the corporation . . . to participating physicians . . . and to such other physicians as are provided for herein . . . ." Finally, a participating physician is defined as "a registered physician . . . who agrees in writing with a medical service

corporation to perform medical service for subscribers and covered dependents and to abide by the by-laws, rules and regulations of such corporation." G. L. c. 176B, § 1. These sections, read together, indicate a clear legislative purpose to limit the advantages of reimbursement by Blue Shield — principally the guarantee of prompt payment at a fixed rate — to those physicians who choose to participate in the program. The plaintiffs, however, suggest that § 7 merely limits the benefits to which subscribers are entitled, but in no way compels Blue Shield to refuse reimbursement to nonparticipating physicians for nonemergency services rendered in the State.

To the extent that the language of § 7 is ambiguous, the ambiguity is resolved by reference to the structure and history of the Blue Shield program as a whole. The critical language of § 7 was included in the initial bill submitted by the Medical Society to authorize the formation of nonprofit medical service corporations, as well as in the successor bill which was ultimately enacted as G. L. c. 176B. See 1941 House Doc. No. 1477, § 7; 1941 House Doc. No. 2301, § 7. The participating physician concept was integral to the original vision of the manner in which medical service plans would operate. Because medical service corporations were to be formed and operated by the medical profession itself, rather than by commercial insurance companies, the drafters of the enabling legislation were faced with the problem of either accumulating the financial reserves required to guarantee the soundness of the program, or finding some acceptable substitute. This problem was addressed by means of the "unit system," under which participating physicians themselves acted as underwriters of risk.

The system was presented to the Commissioner of Insurance, in a statement from the Medical Society, as a substitute for the reserve requirements of traditional insurance plans. The Medical Society's statement to the Commissioner argued that the unit system "constitutes an actuarial substitute for the necessary large financial reserves

of profit-making commercial corporations . . . . This is necessary in commercial corporations because [financial demands] are directly related to contractually binding, inflexible indemnity schedules. *Thus there is substituted in Massachusetts Medical Service, Inc.* for such large financial reserves, *a guaranteed medical-service reserve* to the subscribers during the terms of the contract, *by participating physicians who accept an unguaranteed and fluctuating schedule of indemnification,* the current monetary equivalent of which at any time is determined by an equitable proration of available earned income among the participating physicians" (emphasis added).

The original Participating Physician's Agreement, approved by the Commissioner of Insurance on September 18, 1942, contained the following clause: "*Unit System*: In the event that the amount available in any accounting period for distribution to Participating Physicians . . . shall be insufficient to pay all Participating Physicians in full, then the amount which the Board of Directors decides is available for distribution shall be paid to all Participating Physicians on a pro rata basis." This agreement remains in use at present.

Obviously, the potential benefits to physicians stemming from participation in the plan were accompanied by an element of risk. Had physicians been free to obtain payment for services to subscribers without incurring the risk of reduced payment under the unit system, there would have been little incentive to participate. Against this background, we think it clear that the Legislature intended by G. L. c. 176B, § 7, to limit Blue Shield's system of reimbursement to participating physicians, except in those circumstances in which such services could not reasonably be obtained.

V. *Blue Cross's Authority to Contract for Payment for Physicians' Services.*

To respond to question No. 2 it will be helpful to recast the question into two questions: (a) Is Blue Cross empowered under G. L. c. 176A to cover physicians' services

under the caption "other health services" as that phrase is used in G. L. c. 176A, § 1? (b) By what authority is Blue Cross authorized to contract directly with the Commonwealth to cover services of physicians?

The first question (a) must be answered "no". Blue Cross was permitted to provide benefits only for hospital services until 1953. In that year the Legislature amended G. L. c. 176A, § 1, to permit a hospital service corporation to provide "reimbursement for other health services." St. 1953, c. 287, § 1. These "other health services" have included such nonhospital providers as visiting nurse associations, mental health clinics and home health agencies. Authorization for these contracts is found in the fourth paragraph of G. L. c. 176A, § 5.

It has been stipulated that Blue Cross has never provided benefits for physicians' services except (1) covered services rendered by salaried staff physicians of hospitals and certain other institutional providers with which it has contracts; and (2) nonemergency, in State service rendered by participating and nonparticipating Blue Shield physicians under the State employees' contract.

The Master Medical Certificate issued to subscribers provides that "[b]enefits contained herein for all services and supplies other than those furnished by a physician, dentist, podiatrist, or psychologist shall be provided by Blue Cross," and that "[b]enefits contained herein for services of a physician, dentist, podiatrist, or psychologist shall be provided by Blue Shield."

It is highly unlikely that the Legislature would authorize Blue Cross and Blue Shield to sail on a collision course of competition for subscribers for coverage of physicians' services when Blue Cross's principal course is directed toward hospital services and Blue Shield's towards physicians' services. Equally improbable is a legislative intent to permit Blue Cross to provide the benefits of a full range of physicians' services on a nonparticipating basis and thereby escape the network of regulation found in G. L. c. 176B. In

short, Blue Cross is not empowered to cover physicians' services except in those instances already noted.

The answer to the second question (b) can be found in G. L. c. 32A, § 4. Blue Cross is authorized to contract with State employees because the Legislature vested it with such authority. Under this statute,[6] the Group Insurance Commission is authorized to enter into an agreement for insurance coverage for State employees with Blue Cross "in the same manner as any other insurance company."

The authority for contracts with State employees reposes in G. L. c. 32A in the first instance, and not in G. L. c. 176A. The express reference to G. L. c. 176A in G. L. c. 32A, § 4, encourages us to rule that such provision is special and thus, absent a contrary legislative intent, it must prevail over conflicting provisions, if any, in G. L. c. 176A and c. 176B. See *Boston Teachers Local 66* v. *School Comm. of Boston*, 370 Mass. 455, 472 (1976). Accordingly, we respond to this question by recognizing that payments to physicians for medical services under the contract between Blue Cross and the Group Insurance Commission are authorized by the express language of G. L. c. 32A, § 4, and, as such, this coverage does not derogate from the exclusiveness of Blue Shield's coverage for physicians' services to subscribers who are not under the contract insuring State employees.

In conclusion, we answer question 1(a), "No", 1(b), "Yes", 2, "No".

---

[6] The relevant paragraph of G. L. c. 32A, § 4, as amended through St. 1979, c. 268, § 2, is as follows: "For the purposes of this chapter, any savings bank authorized to engage in the insurance business in accordance with chapter one hundred and seventy-eight and any nonprofit hospital service corporation or nonprofit medical corporation organized under chapter one hundred and seventy-six A or one hundred and seventy-six B shall be and is hereby authorized to enter into a reinsurance agreement as herein provided in the same manner as any other insurance company."